792 F.Supp.2d 129 (2011)
INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 98 HEALTH AND WELFARE, PENSION AND ANNUITY FUNDS, et al., Plaintiffs
v.
RAY HALUCH GRAVEL CO., Defendant.
C.A. No. 09-cv-11607-MAP.
United States District Court, D. Massachusetts.
June 17, 2011.
*130 Kenneth L. Wagner, Charles E. Blitman, Daniel R. Brice, Jennifer A. Clark, Blitman & King LLP, Syracuse, NY, for Plaintiffs.
Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, PC, Springfield, MA, for Defendant.

MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION TO ENFORCE SETTLEMENT AND THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING NON-JURY TRIAL (Dkt. No. 51)
PONSOR, District Judge.

I. INTRODUCTION

This is an action arising under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover delinquent fringe benefit contributions allegedly owed to Plaintiffs under a collective bargaining agreement. This court conducted a three-day bench trial on February 22, 23, and 28 of this year. The memorandum below will first address Defendant's Motion to Enforce a Settlement (Dkt. 51), which was filed at the end of the trial, and then proceed to findings of fact and conclusions of law following the non-jury trial.

II. MOTION TO ENFORCE SETTLEMENT

Defendants have moved to enforce a purported settlement that took place during the course of the trial (Dkt. No. 51). Plaintiffs argues persuasively in response that the parties never entered into a settlement.

A. Factual Background.

The parties engaged in settlement negotiations up until, and subsequent to, the *131 commencement of trial on February 22, 2011. On the morning of February 22, Plaintiffs made a demand of $35,000, and Defendant countered with an offer of $25,000 to be paid over three years. Plaintiffs rejected this offer and made no counteroffer.
During a break in the second day of trial, Defendant told Plaintiffs that it would pay $35,000 as long as that sum could be paid over three years. Plaintiffs informed Defendant that they would respond to the offer at some point in the future. Defendant asserts that it was expecting a response to the second offer later that day, but Plaintiffs maintain that counsel never gave this indication. In any event, the parties did not discuss the issue of settlement again until February 25.
On February 25, Defendant's counsel emailed Plaintiffs' counsel stating, "[s]ince I had not heard from you again regarding our offer, I talked to my clients again and, in the interest of saving any more prep time we will agree to pay the $35,000 all at once." (Dkt. 62, Ex. A, Cahillane email.) Plaintiffs' counsel responded ten minutes later stating, "[a]t this point, $35k is not going to get this case settled.... I will call you later today to let you know whether there's a settlement offer, and, if so, what it is." (Dkt. No. 62, Ex. B, Brice email.) After speaking to his clients, Plaintiffs' counsel called Defendant's counsel later that afternoon stating that the demand was now $120,000 plus an agreement to indemnify Plaintiffs against claims by Defendant's employees. Defendant rejected this offer and filed the present motion seeking to bind Plaintiffs to their original demand of $35,000.

B. Discussion.

A settlement agreement "is a private contract ... and its construction is governed by general contract law." Warner Ins. Co. v. Comm. of Ins., 406 Mass. 354, 548 N.E.2d 188, 192 n. 7 (1990) (internal citation omitted). "Under fundamental principles of contract law, a counteroffer operates as a rejection of the original offer." Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 805 N.E.2d 957, 966 n. 6 (2004) (citing 1 Williston on Contracts § 5.3, at 629 (4th ed. 1990)).
On February 22, Defendant's counteroffer to settle for $25,000 to be paid over three years served as a rejection of Plaintiffs' offer to settle for a lump sum of $35,000. When Defendant told Plaintiffs the following day that they were now willing to pay $35,000, this communication served as a new offer, which Plaintiffs rejected three days later. Defendant's attempt to bind Plaintiffs to the original offer is, thus, contrary to "fundamental principles of contract law."[1]Uno Restaurants, Inc., 805 N.E.2d at 966 n. 6. Accordingly, Defendant's Motion to Enforce Settlement (Dkt. No. 51) will be denied.

III. FINDINGS OF FACT

There are currently five Plaintiff entities in this case, administered by three separate individuals: (1) the International Union of Operating Engineers Local 98 Pension Fund ("Pension Fund"), (2) the International Union of Operating Engineers Local 98 Health and Welfare Fund ("Health and Welfare Fund"), and (3) the Local 98 Engineers Joint Training, Retraining, Skill Improvement, Safety Education, *132 Apprenticeship and Training Fund ("Apprenticeship and Training Fund"), all of which are administered by Barbara Lane; (4) the Central Pension Fund of the International Union of Operating Engineers and Participating Employers ("Central Pension Fund"), as administered by Michael R. Fanning; and (5) the International Union of Operating Engineers Local 98, AFL-CIO ("Union" or "Local 98"), as administered by Eugene P. Melville, Jr.[2] Defendant Ray Haluch, Inc. is a Massachusetts corporation with a principal place of business in Massachusetts, d/b/a Ray Haluch Gravel Co. ("the Company" or "Defendant").
The court makes the following relevant findings of fact.
1. Defendant operates a landscape supply company in Ludlow, Massachusetts. In the early 1990s, the Company was primarily a sand and gravel company performing site work and excavation. By 1992, the Company shifted its focus and began to sell landscaping products. Joanne Martins is currently the president and owner of Ray Haluch, Inc. She has held these positions since her father, Raymond Haluch, retired in 2006. In the off-season, she runs the Company with the help of one other full-time employee and one part-time employee. In the warmer months, the Company employs approximately seven individuals full-time.
2. The Union has geographical jurisdiction over Western Massachusetts, Vermont, and Western New Hampshire. It consists of approximately 1300 members and maintains collective bargaining agreements with approximately 150 employers.
3. The Union operates a non-exclusive hiring hall, under which employers may seek employees referred by the Local 98 hiring hall or directly hire applicants, regardless of union membership. If a nonmember is hired, the employee must become a union member after thirty days of employment.
4. Since at least May 1, 1988, the Company has entered into a series of collective bargaining agreements with Local 98. The most recent agreement was effective from May 1, 2005, through April 30, 2011 ("the Agreement"). Raymond Haluch, as noted, owned the Company until his daughter took over in 2006. Haluch signed the Agreement and, at the time he signed the Agreement, Haluch thought the Agreement only required him to pay union benefits on behalf of one specific employee named Todd Downey. He did not consult with an attorney and did not realize that the scope of the Agreement was much broader.
5. Article I of the Agreement reads as follows:
Scope of Employment: The terms of this Agreement shall apply to all work within the jurisdiction of the Operating Engineers, Hoisting and Portable Branch, in connection with all operations usually performed in the sand and gravel industry, described in Article IV, below.
6. Article IV of the Agreement reads as follows:
Employees are to be classified as follows:
1. Superintendent of Equipment
2. Master Mechanic
3. Maintenance Mechanic, Operators on shovels, cranes, drag-lines, bulldozers, plant operators, front end *133 loaders, power leaders of all types and similar equipment.
7. Article VI of the Agreement states that employers must pay the rates set forth in the Agreement "for each payroll hour ... for each employee covered by this Agreement."
8. Todd Downey worked part-time for the Company as a mechanic for several months between 2004 and 2005. During that time, the Company paid Downey more than $24 per hour even though the Agreement only required the Company to pay him $14.71 per hour.
9. The Company considered Todd Downey to be an employee covered by the Agreement and, accordingly, remitted payments to the Local 98 Funds on his behalf.
10. Eugene "Mitty" Melville, the business manager of Local 98, understood "hoisting and portable branch" under Article I to mean "heavy equipment" or "all earth-moving equipment." He understood the sand and gravel industry to include "the processing of aggregate" and the use of "pits and quarries." He also believed that Ray Haluch, Inc. was engaged in such operations. Melville personally observed two individuals operating loaders on the premises, and he believed the use of loaders constituted Union work covered by the Agreement. Melville was aware that an individual named Martin Jagodowski was working for Ray Haluch, Inc., but Melville did not make an effort to collect Union dues from him.
11. Jagodowski worked for Ray Haluch, Inc., from September 2005 to September 2006. Each month during that period Jagodowski worked on average 178 hours for the Company. The Company's customers at that time were a combination of homeowners and commercial contractors. Jagodowski performed a number of jobs for the Company, including helping out in the sales area, loading commercial dump trucks, and helping retail customers load their vehicles. In the course of his employment, Jagodowski at times operated a front-end loader, bucket loader, portable plant, forklift, and Bobcat. Jagodowski spent seventy percent of his time using the above equipment, and he spent less than five percent of his time repairing the equipment. In the "off-season," which extended from November through February or March, Jagodowski also spent time organizing the shop and painting equipment.
12. The Company did not consider Jagodowski to be an employee covered under the Agreement and, accordingly, did not remit payments to the Local 98 Funds on his behalf.
13. After Jagodowski left the Company in September 2006, the equipment he used, e.g., the front-end loader and bucket loader, remained at the Company. Other employees used that equipment after Jagodowski left and still continue to do so from time to time. The Company currently does not keep a record of the individuals who use the equipment and how long they use it.
14. In September 2004, the Trustees of the Local 98 Funds adopted a policy of conducting payroll audits of all contributing employers. In 2007, William Shannon, assistant director of audit operations at the accounting firm Schultheis & Panettieri, LLP, was asked to conduct an audit of Ray Haluch, Inc. Shannon's first audit covered the period between January 1, 2005, and March 31, 2009. Shannon conducted a second audit covering the period between April 1, 2009, and December 31, 2009. Shannon prepared a third and final audit report at the request of Plaintiffs' counsel estimating the covered hours worked by unknown employees between October 2006 and October 2010, based on the known *134 work hours of Martin Jagodowski from September 2005 through September 2006.
15. The Company notified the Local 98 Funds by letter dated December 28, 2010, that it sought to terminate the 2005 Agreement, effective April 1, 2011.

IV. CONCLUSIONS OF LAW

Plaintiffs now seek to recover delinquent fringe benefit contributions (plus interest, liquidated damages, and attorneys' fees) for hours worked by Martin Jagodowski and for hours worked by unidentified employees doing the same sort of work as Jagodowski after Jagodowski left the Company in September 2006. Plaintiffs originally sought to recover delinquent contributions for hours worked by two other employees, Todd Downey and William Condon, but did not pursue these claims at trial.

A. Whether Martin Jagodowski was a Covered Employee under the Agreement.

Defendant does not dispute the fact that it failed to remit payments to Plaintiffs on behalf of Martin Jagodowski. Instead, Defendant argues that the Agreement did not cover Jagodowski. This court disagrees. While Defendant correctly observes that relevant provisions of the contract are ambiguous, the court finds Defendant's suggested construction and application of these provisions unpersuasive.
"For purposes of interpreting the meaning and scope of [collective bargaining agreements], this court is guided by settled principles of contract interpretation." R.I. Carpenters Annuity Fund v. Trevi Icos Corp., 474 F.Supp.2d 326, 335 (D.R.I.2007) (citing Burnham v. Guardian Life Ins. Co. of Am., 873 F.2d 486, 489 (1st Cir.1989)). Contract language is ambiguous if its terms "are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir.1995) (quoting Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir.1989)).
While the issue of whether a contract is ambiguous is a question of law, the issue of how to construe an ambiguous provision is one of fact. See Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 219 (1st Cir.2006). Where ambiguity exists, "the ultimate resolution of it typically will turn on the parties' intent." Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 178 (1st Cir.1995). This inquiry requires courts to "consider extrinsic evidence insofar as it sheds light on what the parties intended." Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 54 (1st Cir.2001). Specifically, courts may look to "the scope of other related collective bargaining agreements, as well as the practice, usage and customs pertaining to such agreements." Transp.-Comm'n Employees Union v. Union Pac. R.R., 385 U.S. 157, 161, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966).
This court denied Defendant's motion for summary judgment due to an apparent ambiguity in the Agreement. Article I states that the Agreement applies "to all work within the jurisdiction of the Operating Engineers, Hoisting and Portable Branch, in connection with all operations usually performed in the sand and gravel industry, described in Article IV, below." (Trial Joint Ex. 1.) Despite this language, Article IV offers no "description" of work performed in the industry, but merely lists three classifications of employees covered under the Agreement: (1) superintendent of equipment, (2) master mechanic, and (3) *135 maintenance mechanic/operator. (Id.) This last category includes "operators on shovels, cranes, drag-lines, bulldozers, plant operators, front end loaders, power leaders of all types and similar equipment." (Id.)
These provisions are notably unhelpful in both breadth and detail. Of most relevance here is the lack of any explanation concerning how employees receive the above classifications and who determines whether those classifications are accurate.[3] Plaintiffs contend that Martin Jagodowski was an employee covered under the Agreement, but Defendant disagrees, asserting, in essence, that Jagodowski cannot be classified properly under any of the three categories in Article IV and that the parties never intended to cover him under the Agreement.
To resolve this dispute, the court heard testimony from multiple witnesses over the course of a three-day bench trial. Most significantly, Jagodowski himself testified that he spent seventy percent of his time using front-end loaders and other heavy machinery. He spent another roughly five percent of his time repairing such equipment. This testimony was uncontradicted.
In their proposed findings of fact, Defendant asserts that Jagodowski did not actually mean that seventy percent of all work he performed involved the use of heavy equipment, because during the off-season, which lasted for most of the winter, he was engaged primarily in painting equipment and organizing the shop. This argument, however, ignores the directness and clarity of Jagodowski's testimony. When asked "what percentage of your time did you spend in your workday on average operating the equipment you have listed here?" he answered, "Again it's seasonal, but if I had to take a guess, I'd probably say 70% of the time." (Tr. 2/23/11 at 121-22.) Thus, Jagodowski clearly contemplated the seasonality of the business when he gave his estimate. To remove all doubt, Plaintiffs' counsel followed up with the question: "All totaled on average?" Mr. Jagodowski responded: "Correct." (Id.)
Even in light of Jagodowski's undisputed, extensive operation of heavy equipment listed in the Agreement, Defendant maintains that the parties did not intend to cover work performed by Jagodowski when they signed the Agreement. In support, Defendant relies on several pieces of evidence concerning the parties' intent. None is persuasive.
First, Defendant elicited testimony from several witnesses attempting to prove repeated violations of the Agreement, such as ignoring the wage rates set forth in the Agreement or failing to collect dues from other Company employees who were using heavy equipment. Such evidence, Defendant argues, indicates that the parties considered the contract to be "meaningless." (Dkt. No. 67, Def's Proposed Findings at 4.)
This argument is both factually and legally unfounded. The parties knowingly bound themselves to this contract, and they made no effort to repudiate it during the relevant time period. Furthermore, Defendant made remittances on behalf of at least one employee under the Agreement, and Plaintiffs collected these remittances. All of this points to the existence and continuation of a binding contract. Moreover, the failure to enforce a *136 particular contractual provision does not negate the entire contract. See, e.g., 13 Williston on Contracts § 39:35 (4th ed. 1990) ("[W]hile nonaction by both parties may constitute a waiver and mutual negation of a particular provision, the rest of the contract will remain in force where the parties, by their acts and statements, show that they consider the agreement to otherwise retain its vitality.").
Second, Defendant suggests that the parties' past practice also indicates that they did not believe that Article IV applied to anyone other than Todd Downey. Defendant has argued that "[i]t is absurd to think that the Union, believing that everyone working in Haluch's yard was covered by their agreement, saw them working there, but simply decided to do nothing for eighteen years." (Dkt. No. 67, Def's Proposed Findings at 22 (emphasis in original).) Even after trial, however, the court has little evidence before it of other workers who operated heavy equipment for the Company in the years prior to Jagodowski's employment. It is unclear how many employees performed this work, what percentage of their time was spent performing such work, or even what their names were. Moreover, Defendant did not present any evidence indicating that Plaintiffs had actual knowledge of the extent of the work being performed or the individuals performing such work over an eighteen-year period.
Third, Defendant points to the testimony of Ray Haluch, who owned the Company at the time the parties signed the Agreement and who, in fact, signed the Agreement on behalf of the Company. Haluch stated that when he signed the contract, he was under the (mistaken) impression that it covered Todd Downey and no one else. Haluch testified credibly, but his intention or understanding cannot trump clear language in the Agreement stating that it covers not one employee but several types of employee. (See Joint Trial Ex. 1, Art. I.) The ambiguity is not whether the contract covers more than just Todd Downey; it absolutely does. Again, the ambiguity lies in how employees are to be classified. Can an employee who operates a loader ten percent of the time be classified as a "maintenance mechanic/operator"? (Id. Art. IV.) Fifty percent of the time? Sixty? In addition, who makes this determination? The contract leaves these questions unanswered.
Whatever uncertainties exist in the terms of the Agreement, it certainly covered Martin Jagodowski. As noted, Jagodowski testified, credibly and without contradiction, that he spent approximately seventy-five percent of his time operating and repairing heavy equipment such as front-end loaders and bucket loaders. These activities undeniably fell under the third classification in Article IV of the Agreement, which included "operators on shovels, cranes, drag-lines, bulldozers, plant operators, front end loaders, power leaders of all types and similar equipment." (Joint Trial Ex. 1, Art. IV.) Accordingly, Jagodowski was a covered employee, and Defendant had an obligation to remit payments to Plaintiffs on his behalf.

B. Amount of Delinquent Contributions.

In addition to the classification of covered employees, a second, related ambiguity involves the extent of the employer's obligation to make contributions on behalf of covered employees. Article VI of the Agreement states that employers must pay the rates set forth in the Agreement "for each payroll hour ... for each employee covered by this Agreement." (Trial Joint Ex. 1.) The Agreement does not specify whether employers must remit payments for each payroll hour spent performing *137 any work or for each payroll hour spent performing covered work.
As explained above, the entire Agreement appears to be drafted with the mistaken (and somewhat surprising) assumption that employees would perform only covered work or non-covered work, and it does not contemplate the possibility of employees splitting their time. Under these circumstances, the most plausible reading of the Agreement is that employers must remit payments only for time spent by covered employees performing covered work.
This conclusion finds support in the uncontradicted testimony of William Shannon, assistant director of audit operations at the accounting firm Schultheis & Panettieri, LLP. In response to an inquiry from the court, Shannon testified that he makes adjustments to audit reports if he knows that only a certain percentage of the employee's reported time is spent performing covered work.
In light of the foregoing, the court instructed Plaintiffs to calculate unpaid contributions based on seventy-five percent of Jagodowski's hours worked between September 2005 and September 2006. Accordingly, Plaintiffs submitted a revised spreadsheet, revealing $10,267.11 in delinquent contributions and deductions, $8,545.31 in interest through March 2, 2011, and $8,084.99 in liquidated damages, totaling $26,897.41.[4] (See Dkt. No. 54, Ex. C.) Defendant has not challenged these calculations.

C. Unpaid Contributions on behalf of Unknown Employees.

Plaintiffs also seek an additional $156,988.54 based on Plaintiffs' estimates of covered work not recorded by Defendant.[5] Plaintiffs argue that, where an employer fails to maintain adequate records for examination by an employee benefit plan, the plan is entitled to estimate the delinquency and the employer has the burden of disproving this estimate. Here, Jagodowski terminated his employment with the Company in September 2006, and Defendant did not remit contributions for covered work performed by Jagodowski's hypothetical substitutes after he left. Accordingly, Plaintiffs estimated that these putative substitutes performed 242 hours of covered work each month from October 2006 through October 2010, totaling $156,988.54 in additional delinquent contributions.[6] Plaintiffs have failed to offer sufficient, persuasive support for this substantial enhancement of damages.
The relevant ERISA provision reads as follows:
[E]very employer shall ... maintain records with respect to each of his employees sufficient to determine the benefits *138 due or which may become due to such employees. The plan administrator shall make a report, in such manner and at such time as may be provided in regulations prescribed by the Secretary, to each employee who is a participant under the plan....
29 U.S.C. § 1059(a)(1). Plaintiffs rely on several cases in which federal courts of appeals have held that a failure to maintain records in accordance with § 1059(a)(1) shifts the burden onto the employer to provide evidence of hours worked. See, e.g., Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc., 30 F.3d 692, 696 (6th Cir.1994); Brick Masons Pension Trust v. Industrial Fence & Supply, 839 F.2d 1333, 1338 (9th Cir.1988); Combs v. King, 764 F.2d 818, 826 (11th Cir.1985).
These cases are inapposite. In all three, it was clear that the relevant employees were, in fact, indisputably performing covered work, and the employer failed to maintain any records concerning the work performed. See, e.g., Mich. Laborers' Health Care Fund, 30 F.3d at 696 ("[The employer] provided no records at all with respect to 80% of the work performed under the collective bargaining agreement...."); Brick Masons Pension Trust, 839 F.2d at 1338 (9th Cir.1988) ("It is undisputed that these 35 [employees] performed some covered work for Industrial...."); Combs, 764 F.2d at 826 (holding that burden shifted to employer who had failed to maintain records for hours worked by defendant's "classified employees").
In contrast, this court has no evidence before it indicating that any other classified employee actually performed covered work under the Agreement after Jagodowski left. As noted, § 1059(a)(1) requires employers to make a report on behalf of "each employee who is a participant under the plan." 29 U.S.C. § 1059(a)(1) (emphasis added). See also Mich. Laborers' Health Care Fund, 30 F.3d at 695 ("Section 1059 imposes a duty of responsibility and record keeping on employers with respect to all employees who are participants in an employee benefit plan.") (citation and quotation marks omitted).
The only relevant evidence put forth at trial was the testimony of Joanne Martins, the Company's current president and owner, who stated only that the heavy equipment used by Jagodowski continued to remain in operation, to some extent, after he left. She did not testify (and Plaintiffs did not produce any other evidence) concerning who these supposed employees were, what percentage of their time was spent operating the equipment, or exactly which equipment they operated. Simply put, Plaintiffs have offered no evidence, beyond speculation, that Defendant employed other individuals who could be classified as participants under the Agreement after Jagodowski left and who would trigger the record-keeping requirements of § 1059(a)(1). Since they failed to prove that Defendant violated § 1059(a)(1), Plaintiffs are not entitled to contributions for unidentified work performed by unidentified employees between October 2006 and October 2010.

V. CONCLUSION

For the foregoing reasons, the court hereby finds for Plaintiffs in the total amount of $26,897.41. The clerk will enter judgment for Plaintiffs in this amount. The court will rule on Plaintiffs' pending motion for attorneys' fees (Dkt. 69) in a separate memorandum to follow.
It is So Ordered.
NOTES
[1] Defendant's choice to move forward with the trial after receiving Plaintiffs' offer also clearly signaled rejection. See 17 C.J.S. Contracts § 67 ("An offer is rejected when the offeror is justified in inferring from the words or conduct of the offeree that the offeree intends not to accept the offer....").
[2] By agreement of the parties, original Plaintiffs International Union of Operating Engineers Local 98 Annuity Fund and International Union of Operating Engineers Local 98 Cooperative Trust, and Defendant Raymond Haluch, are no longer in the case.
[3] In addition, as discussed below, the Agreement does not clearly state whether the employer must remit payments for all work performed by classified employees or only for time spent performing covered work. This is an especially critical omission for employees such as Jagodowski, who regularly performed both covered and non-covered work.
[4] Plaintiffs' original estimate, which did not account for the twenty-five percent reduction, included $13,689.39 in delinquent contributions and deductions, $11,393.72 in interest through March 2, 2011, and $10,779.95 in liquidated damages, totaling $35,863.06. (See Dkt. No. 54, Ex. A.)
[5] This figure consists of $82,921.30 in estimated delinquent fringe benefit contributions, $4,361.00 in deductions, $34,880.69 in interest, and $34,825.77 in liquidated damages. (See Dkt. No. 54, ¶ 13.)
[6] Although this point is mooted by the court's ruling below, it is worth noting that Plaintiffs' calculations (based on 242 hours worked per month) grossly overstate Jagodowski's actual hours worked, which, by all accounts, averaged 178 hours per month from September 2005 through September 2006. When the court pointed out this apparent discrepancy, Plaintiffs explained that they arrived at the figure after dividing Jagodowski's total monthly income by the (significantly lower) wage rate established in the Agreement, resulting in an inflated number of hours worked per month.