Connors, Thomas A., J.
The plaintiffs, Applied Reprographics, Inc. (AIR) and an allied entity, Sagamore Realty Corp. (Sagamore), brought this lawsuit against the former lender of both, defendant Citizens Bank of Massachusetts (Citizens). The plaintiffs claim aggrievement from the bank’s action in having called a number of the loans in which they had executed promissory notes, and they allege in the complaint counts of breach of contract, breach of the covenant of good faith and fair dealing, intentional misrepresentation, and business tort under c. 93A. Citizens filed a counterclaim which seeks indemnification of its legal fees and costs pursuant to provisions contained in the parties’ contracts governing the loans.
Trial was held before the court, without jury, on December 22, 23, 28 and 29, 2011. The parties requested and were granted to February 10, 2012 to file their post-trial submissions. Their requests to file responses to the other party’s submissions were also allowed, and these were filed later in the month of February. Findings of fact, the court’s ruling and order follow.
Findings of Fact
1. The plaintiff AIR is a corporation whose headquarters has been located in Quincy for several decades. It is in the printing business and it occupies a somewhat specialized niche in servicing architectural, engineering, and construction entities for their particular printing needs and in providing to such entities specialized equipment for such purposes. AIR has a related business entity which operates in Watertown and at one time also had a third in Boston.
2. The properly which AIR occupies is owned by Sagamore. AIR is a closely-held company controlled by a few individuals, and those same persons are also the sole owners and are in control of Sagamore.
3. In the nineteen-nineties, AIR had a banking relationship with Braintree Savings Bank. That bank made a number of loans to the two plaintiffs for financing of their business needs.
4. During the following years, Braintree, like many others a smaller local bank, passed out of existence when it was acquired by a larger bank. Through this acquisition process, the notes held originally by Brain-tree eventually ended up owned by the defendant by 2001.
*41 5. There were ten notes in all which Citizens held for money which had been lent to the plaintiffs. Each of these was evidenced by a promissory note, each of which had similar, but not wholly identical terms.
6. The loan documentation between Citizens and its predecessor lenders and its client AIR was predictably lengthy. One provision of the agreement required that AIR through a certified public accountant furnish on an annualized basis to the bank an audit of the company’s finances. That provision specifically required the accountant calculate a figure known as “Debt Service Coverage Ratio (DSR).” This figure represented, with adjustments for depreciation and capital expenditures, the ratio of AIR’s net income divided by its debt service, with the loan document at issue requiring a figure of 1.2/1.
7. Throughout the many years that the creditor debtor relationship existed between Citizens and its predecessors and AIR, the latter was never late with a payment. Additionally, it did properly engage qualified accounting firms to prepare the annualized audit and did provide the audit report to the bank as called for in the loan documents.
8. In the account compiled for the year 2002, AIR’s accountant, Leonard Pepe, CPA, noted that the DSR for the company had not met the 1.2/1 ratio. This was called to the attention of both AIR and of Steven White who at that time was the bank’s loan officer responsible for supervising its loan relationship with the company, and White had issued to AIR notice that this requirement of the loan agreement was waived for that year.
9. During 2003, supervision of the loan portfolio for AIR and Sagamore at Citizens was transferred from White to Thomas Landers. Landers reviewed the annual reports which Pepe prepared for AIR, including that prepared for the year ending December 31, 2004. That report indicated that AIR was presently not in compliance with the loan covenant regarding its DSR which was calculated as .92/1.
10. Landers and Pepe met in December of2004 and discussed the 2004 annual report. In their e-mail exchange which discussed the meeting and AIR and Sagamore’s finances, Landers did not raise any issue concerning a claim that AIR was in breach of any loan covenant relating to the business’s DSR.
11. Part of his duties called for Landers to conduct risk analysis to evaluate whether a debtor client such as AIR posed potential for risk to Citizens for repayment of the loans. In reviewing files relating to AIR’s loans with bank in early 2005, Landers developed some concerns about its long-term fiscal health. These related to a drop in its revenues and in its net income and its cash flow.
12. Citizens quantifies its estimated risk factor with loans to a particular customer through ascribing a number on a one to ten scale, with the higher numerals representing greater risk. Landers determined after reviewing AIR’s files that it had a risk factor of “eight.” This represented an increase over the figure the bank had assigned AIR’s loan risk in prior years.
13. Landers now reviewed in depth AIR’s files, including its loan documents and its auditing statements, and he discovered two areas where he believed that AIR and Sagamore were in violation of their obligations to the bank. The first of these was the DSR as set forth in the 2004 report, referenced above. The second had to do with a change in AIR’s technical ownership structure which had been set up for reasons related to tax considerations.[1]
14. Landers now transferred the files for the loans to AIR and to Sagamore to Citizens’ Special Assets Department, which meant that it was to be dealt with as a distressed loan.[2] No notice was ever sent to the borrowers informing them that the bank was taking this action.
15. The bank official in Special Assets who received the AIR file referred by Landers in May of 2005 was Kenneth Daley whose position was Portfolio Manager. He noted the high numerical assessment rate which had been assigned the outstanding loans, connoting enhanced risk presented. Daley believed that notwithstanding the lack of any prior defaults on payments on AIR’s part, that the company’s specialized niche in printing for professional entities was one which posed risks to its long-term financial health.[3]
16. Daley, who had never before dealt with or met AIR’s principals, contacted them to tell them that he needed to set up a meeting with them to discuss the company’s loans with Citizens. The meeting took place on June 13, 2005 at AIR’s office between Daley and officers of AIR, who included its chief financial officer, James R. Carey. At the meeting, Daley adopted a sharply aggressive tone with the AIR representatives, informing them that their debt service ratio was unacceptable to Citizens and that the bank demanded that AIR address the issues he was raising.[4]
17. Daley wrote to Carey on June 23, 2005 as a follow-up to the meeting, and in his letter set forth figures upon which he stated the bank was basing its DSR calculation. The figure listed of .92/1 was less than the called-for 1.2/1 figure, although it was at substantial variance from the figure which Daley had cited at the earlier meeting.
18. On June 30, 2005, Daley sent a letter to AIR in which he proposed means they might adopt to address what he now termed the company’s “Debt Service Ratio Default.” The letter proposed two options to AIR. The first posited that in exchange for Citizens waiving the default and agreeing to enter a forbearance agreement, AIR would have to pay the bank a $10,000.00 fee, would have its line of credit frozen, and would *42 agree to repay all of its debt to the bank within two months.
19. Under the second option outlined in Daley’s letter, AIR would have to pay the bank $15,000.00 in two installments, would have to reduce its line of credit available from Citizens, submit to tighter financial reporting requirements, and hire a consultant acceptable to the bank to prepare an assessment of the company’s business operations, budget and short-term cash flow. While making reference to the parties’ entering into a “forbearance agreement,” the letter stated that this option was expressly premised on the bank’s reserving its rights as related to the claimed DSR default. The letter concluded with the caveat that neither of the two options had yet been approved by the bank and that it reserved the right to change any term of either of the proposed options that it wished.
20. Carey and AIR’s principals had not anticipated either Citizens’ sudden pronouncement of a claim of default or the bank’s demand through Daley that AIR make cash payments to Citizens and accept other terms affecting its operations as conditions for not immediately calling the loans. AIR promptly began to explore a means of refinancing to avert the threats represented by Daley’s assertion that the company’s loans were in default and could be called at Citizens’ pleasure.
21. On July 27, 2005, while AIR was in the process of attempting to refinance all of its indebtedness with a different lender, it received a letter from Daley. The letter noted that AIR had not agreed to either of the two “workout proposals,” the two alternatives which Daley’s June 30 letter stated the bank had not yet committed itself to agreeing to enter with AIR. He went on to state that the bank would be treating any of AIR’s loans in which the debt service ratio did not meet the loan document requirements as retroactively in default back roughly seven months to January 1. The letter concluded that the bank would be moving to collect the outstanding loan amounts in full.[5]
22. One day later, the bank’s attorney by certified mail made demand to AIR for payment of $206,323.35 due on the loan within five days, informing AÍR that it also was liable for the bank’s attorneys fees and costs incurred in enforcing the note. It stated that if the loan were not repaid by August 2, 2005, AIR would be subject to a penalty of five percent on all overdue principal and interest, and that an additional penally was being imposed in the form of default interest accruing at the rate five percent above prime on that same amount.
23. AIR’s attorney, Ralph Rivkin, was immediately in touch with the bank’s representatives concerning the demand letter. He protested Citizens’ calculation of the DSR and its lack of timely notice to AIR of claimed default, as well as its failure to afford AIR any opportunity to cure that claimed default.[6] He also pointed out that the bank’s claim for retroactive default interest was nowhere authorized in the loan documents.
24. The bank rebuffed Rivkin’s protests, insisting that notwithstanding language in the loan documents which referenced opportunity for cure of a borrower’s default, a default such as failure to maintain proper DSR, as an event which was fixed in time, was not one which came under the agreement’s provision for cure.[7] It further asserted no flexibility on its demand that AIR was liable for default interest, which Citizens’ representatives were computing as 11.25 per cent, being applied retroactively to January 1, 2005.
25. AIR was able to line up replacement financing for all of it and Sagamore’s outstanding loans with Citizens through Eastern Bank and a closing on the loan was planned for August 11, 2005. When it contacted Citizens for its loan payoff figures, it was told it needed to repay $435,363.48 for AIR, $110,025.90 for Sagamore, and an additional payment for the bank’s legal fees in the amount of $8,984.82.
26. The closing took place and Citizens was repaid the amounts it had demanded. The monies paid to Citizens were accreted by its failure to reduce AIR’s indebtedness by two automatic pay sums which the bank had already deducted from AIR’s accounts. Additionally, the legal bills it was requiring AIR to pay in order to extinguish its loans to Citizens and to proceed with its refinancing with Eastern reflected an amount $3,080.00 in excess of the $8,984.82 that the bank’s law firm actually had charged it for its services in connection with its dealings with AIR.[8]
27. The erroneous failure to account for the amounts which AIR had been debited before the closing was rectified by a re-crediting when Citizens was informed of this error sometime after the closing. The excess legal expense collected at the closing, however, was not repaid to AIR until January of 2006 several months after plaintiffs’ counsel had notified the bank of the error and after the plaintiffs had instituted this lawsuit.
28. On October 5, 2005, AIR served upon Citizens a c. 93A demand letter. It outlined AIR’s grievances with bank, which included allegations that Citizens had improperly calculated the DSR triggering claim of default, had failed to give proper advance notice of the claim of default, had improperly insisted upon default interest applied retroactively, and had failed to deal with the borrower in good faith when it had sought information concerning the loan and had sought payoff information. That letter cited as AIR’s damages the retroactively charged default interest of $13,915.14; the late fees of $14,081.89; the payment of Citizens’ legal fees, $8,984.82, augmented by the additional $3,080.00 overcharge; and AIR’s *43 own legal fees connected to their sudden need to defend the claim of default and refinance estimated at $8,000.00.
29. The bank responded denying all of AIR’s claim by letter dated October 17, 2005.
30. The plaintiffs filed this lawsuit on December 1, 2005. In its answer and counterclaim, Citizens denied liability; however, it also set forth as an affirmative defense an offer of settlement of $30,000.00 pursuant to c. 93A, §11. That offer was repeated in its subsequent response to the plaintiffs’ later amended complaints. The plaintiffs did not accept the offer of settlement.
Ruling
1. AIR’s Claims against Citizens
AIR and its cognate corporate entity Sagamore press related claims against Citizens for its conduct during the course of the bank’s asserting of a claim for default on the parties’ loan agreements. These allege breach of contract and of the covenant of good faith and fair dealing, along with the torts of intentional misrepresentation and violation of c. 93A, §11, the latter of which is essentially derivative of the other substantive counts alleged.
A. Breach of Contract and of the Covenant of Good Faith and Fair Dealing
The plaintiffs contend that Citizens breached its duty to them by forcing sudden repayment of the loans outstanding through assertion of claims of dubious merit which the bank was alleging were founded upon the parties’ loan documents. They cite Citizens’ assertion of the claim of default which was predicated upon the alleged breach of the covenant related to the DSR, and its insistence on repayment of the entire loan amount as a consequence of the claimed breach. They assert that the bank’s action should have been preceded by notice with an opportunity to cure any claimed default. Instead, they argue, Citizens attempted to exploit its claim of default by demanding monetary payments as the price for inducing the bank’s forbearance from immediate call of the notes. Additionally, they cite Citizens’ insistence that repayment of that loan include sums to which the bank was not entitled, specifically the claim of enhanced default interest retroactive to the months earlier claimed breach and the collection of attorneys fees in excess of that which the bank itself had ever been billed.
The issue concerning the claimed breach of covenant relating to the DSR presents some complexity. The facts at trial do reveal that Citizens at different times had treated AIR and its financial dealings with the co-plaintiff, Sagamore, in disparate ways which did affect how the business’ DSR would be calculated. It is true that AIR’s accountant had reported to Citizens figures for the calendar year ending December 31, 2004 which appeared to demonstrate a DSR figure not in conformity with the covenant’s requirements. At the same time, the bank, through its agent Landers was made fully aware of this non-conformity, and in his dealings with AIR and its accountant, had sounded no alarms with respect to this aspect oftheparties’ creditor-debtorrelationship. Indeed, the bank had waived alike claimed breach of the covenant for a prior year with little fanfare.
On these facts, Citizens was able to assert that AIR’s 2004 annual financial report did place it in breach of the parties’ loan agreement. The question of what should follow a claim of breach of an obligation set forth in the loan agreement based upon the DSR issue is one which also presents difficulty based upon the document’s language. The agreement plainly speaks of a borrower’s right to cure, carving out only the sentence concerning “default on indebtedness." Its language referencing defaults “curable” without definition, engenders some confusion as to whether a past DSR issue, unquestionably a time-fixed occurrence, admits itself to cure. It is certainly arguable that a borrower noticed that the lender is treating it as in default of its loan obligations by virtue of its DSR could take steps to see that its present financial status was brought into conformity. If this provision of the loan agreement were viewed as ambiguous, the plaintiffs would benefit from the fact that the agreement was the product of Citizens or at least of its predecessor in interest. See Merrimack Valley National Bank v. Baird, 372 Mass. 721, 724 (1977) (in cases of ambiguity, as' a general rule, a contract’s terms are construed against the drafter of the doubtful language). But see also Jefferson Insurance Co. of New York v. Holyoke, 23 Mass.App.Ct. 472, 475 (1987) (an ambiguity in a contract does not exist simply because a controversy exists between parties, each favoring its own interpretation).
Whether Citizens was obligated to have provided AIR opportunity to cure the claimed defaults in its obligations to the bank and whether its failure to do so breached its contractual duties to its borrower arising from the parties’ loan agreement, however, does not need to be determined, based upon the actions of Citizens which followed the claimed breach. At this juncture, Citizens was now asserting not only that AIR was in breach and as a consequence would have to pay an enhanced default interest rate, but that the previously undeclared default was triggering the assessment of seven months prior penalty interest against AIR. The bank further insisted that for AIR to refinance and discharge its debt to Citizens — an action which the bank was demanding and had actively been seeking since prior to the transfer of the borrower’s file to Special Assets — it would have to include this retroactive interest amount in its payment to the bank. Citizens’ insistence on this was not founded in the parties’ loan documents and the bank’s attempt to *44 force payment of that amount in the circumstances of this case amounted to a breach of its responsibility to AIRunder that agreement.[9]
Eveiy contract governed by Massachusetts law contains an implied covenant of good faith and fair dealing between its parties. Uno Restaurants, Inc. v. Boston Kenmore Realty Group Corp., 441 Mass. 376, 385 (2004). It requires that neither party to an agreement do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Fortune v. National Cash Register Co., 373 Mass. 96, 104 (1977). The duty of good faith and fair dealing concerns the manner of performance of a contract, and the covenant is preserved so long as neither party injures the rights of the other to reap the benefits of the terms of the contract. UNO Restaurants, Inc., supra, at 385.
The actions of Citizens in the present case fit well within the definition of a manner of performance of the contract which was intended to and did injure the ability of AIR to receive the benefits of the parties’ bargain. See Anthony’s Pier Four, Inc. v. HBC Associates, Inc., 411 Mass. 451, 472 (1991). On the facts as presented at trial, Citizens, following a lengthy business relationship which had existed between it and its predecessors in interest and the plaintiffs, reached a determination that it did not wish to continue that relationship. It then set about to find a reason to declare a breach so that it could hasten termination of its lending relationship with AIR and Sagamore. It found that reason in the claimed breach of covenants relating to the DSR and the creation of the then no longer extant business trust.
The manner in which Citizens pursued this claim and what followed constitutes the heart of Citizens’ breach of the covenant. Citizens abruptly informed its client that its loan had been referred to its distressed assets division and the parties needed to meet so that the loans’ status might be addressed. When that meeting was convened, the bank’s representative, Daley, assumed an aggressive posture with its client and presented to AIR’s representatives erroneous figures concerning the company’s debt to income ratio, which served to cast its financial situation in stark terms. Daley followed up the meeting with his letter which demanded cash payments to the bank as a price for possible postponement in calling the note, although that letter made plain that the bank itself was not committing to either of the options it was presenting in its letter. Most critically, AIR was told that the company’s indebtedness to the bank was now being accreted by the assessment of a retroactive penalty charged by the bank, a term not expressly authorized in any portion of the parties’ lengthy loan agreement.
Due to Citizens’ conduct, the plaintiffs were required to act on exceptionally short notice to find immediate replacement financing to avert being subject to enhanced payments to Citizens for these amounts as well as to the bank’s legal fees under the note. In order for AIR to escape its loan from Citizens and secure replacement financing, it was required to pay these demanded amounts, which included the retroactive interest penalty. Payments demanded by Citizens at the time of the closing of the loan with Eastern, included two amounts which the bank concedes were mistakenly assessed, one relating to the failure to credit for the two automatic deductions and the second representing a double billing on a portion of the bank’s attorneys fees. While the former appears to have been a good faith error, rectified reasonably promptly by the bank, the latter was never addressed until many months after the closing, after the fairly obvious error had been called to its attention and after the plaintiffs had filed this action.
In short, the conduct of Citizens in attempting and succeeding to affect its predetermined purpose of getting the plaintiffs’ loans off its books was carried out in a manner that breached its obligation of good faith and fair dealing, a matter which is to be inferred from the totality of the circumstances. See T.W. Nickerson, Inc. v. Fleet National Bank, 456 Mass. 562, 570 (2010), citing Nile v. Nile, 432 Mass. 390, 398-99 (2000). The type of conduct at issue compares to that which has been found violative of the covenant of good faith and fair dealing. See Cherick Distributors, Inc. v. Polar Corp., 41 Mass.App.Ct. 125, 127 (1996) (defendant manufacturer’s abrupt termination of plaintiff s distributorship agreement, which defendant had initially sought to justify as based upon an expiration of a letter of credit, an event which had occurred eighteen months earlier, was adequate to support a finding of breach of the covenant of good faith and fair dealing). See also Tufahljian v. Rockland Trust Company, 57 Mass.App.Ct. 173, 177-78 (2003) (bank’s actions in utilizing its leverage in creditor/debtor relationship in unreasonably attempting to extract financial concessions from borrower above that which was authorized within the parties’ contract constituted a breach of the covenant). [10]
AIR has established Citizens’ breach of contract by virtue of its breach of the covenant of good faith and fair dealing, which inheres in every contract. Fortune v. National Cash Register Co., 373 Mass. 96, 104 (1977) (citations omitted).
B. Intentional Misrepresentation
The plaintiffs contend that in the course of its efforts to force accelerated repayment of the loans owed the bank, Citizens through its agents made purposeful misrepresentations which render the bank liable in tort. In order to prevail on a claim of intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a false statement to the plaintiff concerning some fact which a reasonable person would consider important to the deci *45 sion that the plaintiff was about to make; (2) that at the time that statement was made, the defendant either knew it was false or recklessly made it wilfully disregarding its truth or falsity; (3) that the defendant made the false statement with the intention that the plaintiff would rely on the statement in making its decision; (4) that in making the decision, the plaintiff did rely on the statement, and that reliance was reasonable; and (5) that the plaintiff suffered a financial loss as a result of its reliance on the false statement. See Zimmerman v. Kent, 31 Mass.App.Ct. 77-78 (1991).
The plaintiffs’ claim of deceit as set forth in their Second Amended Compliant focuses upon two assertions made by Citizens through its agents: first, that AIR was in default, and second that it was entitled as a consequence to the payment of retroactive penalty interest. Several of the elements the plaintiff is required to establish appear proven. First, at least with respect to the claim of the bank’s entitlement to retroactivity of enhanced interest payments, the assertion appears false. The issue of the element of knowing untruthfulness or reckless disregard presents a more difficult issue. However, given the conduct at issue, the plaintiff has established reckless disregard by a preponderance of the evidence. See Acushnet Federal Credit Union v. Roderick, 26 Mass.App.Ct. 604, 605-07 (1988) (actual intent to deceive on the part of a defendant is not necessary to a claim for deceit; liability may be found where the accurate facts would be available the person making the misrepresentation through a modicum of diligence).[11]
Plainly the plaintiffs relied upon the statements in governing their conduct to the extent that they did satisfy the increased loan payoff amount demanded as a condition of their ability to secure alternative bank financing. In having to pay more to Citizens than they lawfully should have been required to, in multiple respects, AIR acted to its detriment.
The difficulty with the plaintiffs’ claim on a fraudulent misrepresentation claim, however, rests upon what appears implicit in proving such cases: that the plaintiff was induced to act because it believed, and as a consequence relied upon, the defendant’s statement to be true. See Kilroy v. Barron, 326 Mass. 464, 465 (1950). Here, the plaintiffs were sophisticated business entities who were receiving the advice of counsel. When they were told by Citizens’ representative, Daley, that they were obliged to pay the retroactive interest under the loan agreement, they did not believe that this was correct — in effect, they paid the amounts under protest, as a necessary expedient to securing the new financing. This claim, therefore, falls under the category of those where the plaintiff knows the misrepresentation to be false, and for that reason, fails to establish reasonable reliance, the incurring of a detriment notwithstanding. See Restatement, Second, Torts, §451. See also Bartnett v. Handy, 243 Mass. 446, 448 (1923). Whatever the merits of the plaintiffs’ claims grounded on other theories, a claim for deceit does not lie.
C. Business Tort under C. 93A, § 11
1. Was Citizens’ Conduct Unfair or Deceptive?
The plaintiffs allege that the defendant’s conduct constituted a violation of c. 93A, §11 as unfair or deceptive practices occurring in the inter-business context. In order to prevail on a claim for the violation of the provisions of c. 93A, a plaintiff must establish by a preponderance of the evidence that the defendant had committed an unfair or deceptive act or practice which resulted in harm to it. Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 800-01 (1976). Whether such conduct has occurred must be determined from the facts and circumstances of each case. Commonwealth v. Decotis, 366 Mass. 234, 242 (1974). A precise definition of what constitutes such activity is not provided by the statute, and not every dereliction by a business entity will subject it to liability under ch. 93A. Mechanics National Bank of Worcester v. Killeen, 377 Mass. 100, 109 (1979).
In determining whether an act is unfair, a court looks at whether the conduct complained of falls within some common-law, statutory, or other established concept of unfairness; is immoral, unethical, oppressive, or unscrupulous; or which could cause substantial injury to customers in general. Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 776-78 (1980). See also Morrison v. Toys ‘R Us, Inc., 441 Mass. 451, 457 (2004). Further, the reach of §11 of c. 93A, which proscribes such conduct between business entities, affords to business persons remedies “that elude conventional definitions and categories.’’ Schwanbeck v. Federal-Mogul Corp., 31 Mass.App.Ct. 390, 413 (1991), quoting Doliner v. Brown, 21 Mass.App.Ct. 682, 697 (1986).
The conduct of Citizens fits within the description of conduct which was unfair or deceptive in violation of the statute. As set forth in the prior section dealing with breach of the covenant of good faith and fair dealing, the bank, through its employees, having reached a determination that the plaintiffs’ loans posed for it a troubled asset began to apply pressure to force their immediate repayment. In the course of this, the bank relied upon inaccurate data and inconsistent methods of computing the borrower’s DSR. Most significantly, the bank improperly insisted on back charges for penalty interest not called for in the parties’ loan agreements. The effect of this was to cause for AIR and its affiliate entity an ongoing amassing of amounts claimed as owed to Citizens, an unfair accretion of its debt which drove it to seek immediate replacement financing. The inference that this was Citizens’ intent is reasonably clear, as can be gauged by the facts heard at trial. *46 Examples of these would be the manner in which the strategy of seeking a mechanism for pressuring AIR had arisen while the file was in Landers’ control, as well as Daley’s June 30 letter demanding AIR’s unilateral agreement to make cash and other concessions to avoid the consequence of calling the loans, without committing the bank even to accepting any such offers. Finally, Citizens demanded payment of other amounts as part of its loan pay-off which were not properly chargeable, and as to one of those amounts, the over-charge for attorneys fees, persisted in failure to reimburse the plaintiffs over several months after the issue had been called to its attention.
The bank’s violation of the covenant of good faith and fair dealing, as referenced ante, provides a basis in law for a finding of a violation of c. 93A. See Brewster Wallcovering Company v. Blue Mountain Wallcoverings, Inc., 68 Mass.App.Ct. 582, 606 (2007). Mass. Employee Ins. Exchange v. Propac-Mass., Inc., 420 Mass. 39, 43 (1995). Further, Citizens’ conduct toward its borrower was of the sort of coercive tactic which may be found to give rise to liability under c. 93A. See Renovator's Supply v. Sovereign Bank, 72 Mass.App.Ct. 419, 430 (2008) (citations omitted); Tufankjian v. Rockland Trust Company, 57 Mass.App.Ct. 173, 179 (2003).
2. Was Citizens’ Conduct in Violation of C. 93A Wilful or Knowing?
The plaintiffs argue that the conduct of the defendant in committing unfair or deceptive acts was wilful or knowing, entitling them to punitive damages under §11. Deciding this issue is separate from the baseline determination of unfairness or deception, and it involves an assessment of whether the defendant’s actions partake of “a more purposeful level of culpability.” Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 680-81 (1986). It could perhaps be argued that the bank in certain of its conduct found to violate the statute, such as the assessment of retroactive enhanced interest, was not acting wilfully, but rather simply in a mistaken belief about its rights under the parties’ agreements. Viewing the conduct at issue as a whole, however, the wilful or knowing quality of the commission of the unfair acts has been established by a preponderance of the evidence.
The bank was, at best, relying on a strained interpretation of the loan documents to attempt to extract a retroactive assessment which Daley tacitly acknowledged in his testimony. Further, there is the factor that the triggering event for the claimed default, the DSR calculation, was contained in Pepe’s annualized report which had been provided the bank in December of 2004. Its production was followed by wholly amicable discussions between the bank’s employee, Landers, and AIR’s accountant without the raising of any concern that the company’s loan relationship with the bank was now in trouble, much less that the company would now be responsible for a penalty interest assessment from January 1, 2005 forward. Finally, there are other instances which mark the tone and tenor of the bank’s conduct directed toward the plaintiffs. These would include the presentation of grossly inadequate figures concerning AIR’s finances and its unexplained retention of the excessive portion of the legal fee charge. Based upon the totality of the factual circumstances, a finding of wilful conduct is warranted. See Tufankjian v. Rockland Trust, 57 Mass., at 174 (coercive conduct by bank toward borrower furnished basis for trebling of damages). See also Renovator's Supply v. Sovereign Bank, 72 Mass. at 431 (finding of wilfulness on the part of defendant bank supported by the accumulated evidence of unfairness toward the plaintiff borrower).
3. Did Citizens in its Answer to the Complaint Make a Reasonable Offer of Settlement?
A defendant who has committed a wilful or knowing violation of c. 93A may, nonetheless, under the provisions of §11 escape the imposition of multiple damages by making a reasonable offer of settlement with its answer. That provision which parallels the analogous response to a thirty-day demand letter under the portion of the statute dealing with wrongs against consumers has the same purpose of facilitating settlements and fixing damages. International Fiduciary Co. v. Wilson, 387 Mass. 841, 857 (1983).
In its response to the plaintiffs’ initial action and to its later amended complaints, Citizens made an offer in settlement in the amount of $30,000.00. It argues that this tender effectively serves to insulate the bank from any liability for enhanced damages, notwithstanding any finding of wilful or knowing conduct. On this issue, Citizens bears the burden of proof as to the reasonableness of its offer. GRJ Associates, Inc. v. Stainsafe, Inc., 338 F.Sup.2d 215, 239 (D.Mass. 2004), citing Kohl v. Silver Lake Motors, Inc., 369 Mass. 795 (1976).
In this case, the plaintiffs in their 93A demand letter had sought payment of damages which totaled $48,061.85. The constituent parts adding up to this figure were as follows: $27,997.03 for late fees and penally interest paid by the plaintiffs; $8,984.82 in fees which Citizens had been required to pay its own attorneys which the plaintiffs were required to reimburse Citizens in connection with its refinancing of its loans; $3,080.00 representing the excess legal fees which Citizens had erroneously charged the plaintiffs; and $8,000.00 as the estimate of the plaintiffs’ own legal fees incurred in the parties’ legal imbroglio. The court agrees with Citizens that the plaintiffs’ own legal fees are not countable in making the assessment of what was a reasonable offer to compensate the plaintiffs for the harm actually suffered under the case law. See GRJ Associates, Inc. v. Stainsafe, Inc., 338 F.Sup.2d at 239, citing Kohl *47 v. Silver Lake, Inc. Excluding that figure from the total, this would place the plaintiffs’ demand at $40,061.85.
While the issue is perhaps close, a straight comparison of the $30,000.00 dollar figure offered by Citizens with the amount of damages the plaintiffs suffered by having to pay the enhanced amounts to the bank including the bank’s legal fees — a figure which is $10,061.85 higher — renders the offer of settlement inadequate. However, a second reason exists why this is so, and this relates to the counterclaim being asserted by Citizens against the plaintiffs. In that cause of action, Citizens was seeking payment for all of its legal fees and expenses under the indemnification provision which was contained in the loan agreements with the plaintiffs. In its answer, Citizens was not representing that it would be withdrawing that claim as part of its offer of settlement. Nothing in Citizens’ response to the plaintiffs’ complaint indicates that if the plaintiffs had accepted the offer and thereby effectively settled the business tort claim under c. 93A that this would have relieved them of the necessity of having to continue to defend against the bank’s claim for full reimbursement of its own expenses founded upon the broadly-worded indemnity provisions. Indeed, such litigation, as referenced in the section of this ruling dealing with the counterclaim, would have involved issues inextricably linked with those in the plaintiffs’ 93A claim, namely, the nature of the bank’s actions in connection with the loan relationship and whether they met the standard of wilful misconduct or gross negligence.
Determination of the reasonableness of the offer of settlement is a question of fact “which must be determined in light of all of the attendant facts and circumstances.” Whelin v. Markowski, 37 Mass.App.Ct. 209, 215 (1994); Patry v. Harmony Homes, Inc., 10 Mass.App.Ct. 1, 6 (1980). The fact issue as to whether the bank’s proposed offer of settlement contained in its answer was reasonable must be viewed more globally than the simple resolution of only the part of the claim that related to the damages under c. 93A in light of the unusual facts of this case involving the interrelation of the plaintiffs’ claims with the bank’s counterclaims.
Given both of the reasons cited above, the offer of settlement contained in Citizens’ answer does not serve to negate the award of multiple damages for its wilful or knowing conduct. The court determines that on the facts presented, and with the showing of wilful conduct, the appropriate disposition is the award to the plaintiffs of double their actual damages which were $36,981.85.[12]
D. Citizens’ Counterclaim for Indemnification
Citizens brings two counts in counterclaim against the plaintiffs each of which allege liability under the parties’ agreements for all legal fees. It is undisputed that each of the loan agreements between Citizens and AIR and Sagamore contains a clause which states that the borrower will indemnify the bank against any expenses relating to any claim which the borrower might bring, including payment of the bank’s reasonable attorneys fees and expenses which arise from the bank’s relationship with the borrower. That clause expressly states that it is to remain effective even after termination of the loan obligation. It does contain an express exclusion of borrower liability for any claim arising from the gross negligence or wilful misconduct of the bank.
The bank points to a ruling in a parallel lawsuit involving the same loan transactions, Citizens Bank of Massachusetts v. Cully et al., Suffolk Superior Court No. SUCV2007-3339 E. In that case, Citizens sought a declaratoiy judgment concerning the obligation of AIR and Sagamore’s principals for indemnification under guarantees signed at the time of the making of the companies’ loans. In a motion for partial summary judgment, the court ruled that the guarantors were bound to indemnify Citizens for expenses connected to the loan transactions, unless Citizens’ own conduct met the provision’s exception for gross negligence or wilful misconduct on the part of the lender. Citizens argues that given the identity of issues and congruence of interest between the plaintiffs here and the guarantors in that action, that ruling is binding upon the parties here.
Citizens’ argument may well have merit as to the claimed preclusive effect of that ruling under the doctrine of “law of the case." See. e.g. Chase Precast Corp. v. John J. Paonessa Co., Inc., 409 Mass. 371, 379 (1991). Assuming, arguendo, that this is so, however, this does not aid Citizens in its attempt to recover all of its legal fees and expenses on the facts of this case, in light of the agreement’s exclusion for gross negligence and wilful misconduct. As amply set forth above, the bank’s actions here with respect to its loan transactions with the plaintiffs did amount to a breach of the covenant of good faith and fair dealing. They also constituted unfair or deceptive acts and were determined to be wilful and knowing, triggering liability for punitive damages. Given these factual findings, this would place Citizens’ conduct in that categoiy of actions having a level of culpability which would disqualify it from reimbursement for fees and expenses under the indemnification provision.[13]
Order
After full consideration of the trial evidence including the exhibits, judgment enters for the plaintiffs on their claims for breach of contract, breach of the covenant of good faith and fair dealing, and violation of c. 93A. Damages are awarded in the amount of $36,981.85 which are doubled under the count for business tort to $73,963.70 plus reasonable attorneys fees and expenses. The plaintiffs are to file a submission outlining those costs and expenses sought within twenty days of the date of this decision and to have *48 served same on the defendant. The defendant is to serve any response to the plaintiffs’ application within thirty days of this date.
Judgment enters for the defendant on the plaintiffs’ claim for intentional misrepresentation. Judgment enters for the plaintiffs/defendants in counterclaim on Citizens’ counterclaim for contractual indemnification.

 The credible evidence at trial reflects that AIR had made Citizens fully aware of that action at the time it had taken place. By the time of Landers’ review of the issue, AIR had, in fact, already dissolved the business tmst, and thereby had restored the status quo ante.

 The trial evidence reflects that Landers’ discovery of and expressed concern about claimed defaults on AIR’s part followed rather than preceded his more generalized concerns about the company’s fiscal soundness. Indeed, in an internal bank document labeled “Risk Rating Downgrade,” written as late as May 20, Landers refers to the covenant in AIR’s loan pertaining to the DSR as one “previously unknown to the writer.” Landers’ testimony that it was Citizens’ wish during this time period to retain the plaintiffs as banking clients is not credited.

 Specifically, the Citizens’ employees who had compiled the risk assessment in their capacity of monitoring the bank’s loans to AIR were concerned that the company was too dependent on a few large construction companies as clients, with the potential for significant drop in AIR’s revenue should any one of them look elsewhere for printing services or decide to do take printing functions in-house. Daley also had concerns that AIR seemed to be deriving a growing percentage of its revenue from equipment sales rather than printing services. Daley believed that these factors presented threats to AIR’s future ability to generate revenue to deal with its debt service.

 Carey testified, and Citizens does not dispute, that this was the first time that the bank had ever informed AIR’s representatives that it had concerns about AIR’s debt service which needed to be addressed, or otherwise was harboring concerns about AIR’s financial solvency. He further testified that during the meeting, Daley contended that AIR’s DSR figure was as low as .4/1, although when questioned on this point, had struggled with calculations to demonstrate his basis for that conclusion. The court credits Carey’s testimony on these points.

 In his testimony, Daley sought to justify the bank’s admittedly aggressive stance toward its long-term clients by citing the plaintiffs’ failure to have responded timely to his insistent demands for some action on their part following the parties’ first meeting the prior month. The evidence on this issue is at best ambivalent, with both sides insisting that voice-mail messages had been left for the other in June and July of 2004. It is unquestioned that the plaintiffs’ principals were caught wholly by surprise by Citizens’ stance as expressed at the June 13 meeting, and the fair inference is that they were understandably focusing their efforts on securing alternate financing to escape the sudden threat of calling of the loans. Daley also cited as support for his approach that AIR had a history as a difficult client. However, beyond one conclusory statement contained in Landers’ report at the time that he was sending the loan file to Special Assets in late May, that characterization finds no factual support either in Landers’ testimony or in the voluminous record of the parties’ history of dealings contained in the trial exhibits.

 Contributing to the confusion between the parties concerning calculation of the DSR was Citizens’ practice for certain years of treating AIR and its allied entity Sagamore as one unit, while treating it in other years as separate. This distinction was impactftil for the calculation of the DSR as for instance, in whether rental paid by AIR to Sagamore was treated as cash available to service its debt. The court credits the testimony of AIR’s expert on banking practices, Robert Petrie, that the DSR calculation properly should have treated payments to such a related entity as countable as cash available for debt service. Commonsensically, Citizens’ treating of the issue disparately in different years in the circumstances of this case was not warranted.

 The loan agreement does set forth a right to cure any default other than a default on indebtedness, so long as the borrower has not been given notice of similar default in the preceding twelve months. The provision, however, makes reference to any default subject to this right to cure as applying only if the default is “curable,” without providing further elaboration.

 Apparently, a portion of the legal fee had erroneously been included with the gross loan pay-out figure creating the double-charging of AIR.

 When he testified at trial, Daley conceded that there was no part of the parties’ loan agreement he could cite which authorized the claim for retroactive interest for an unnoticed claim of default. He also admitted that the rationale he employed to justify that assertion, the time-fixed and non-curable quality presented by the DSR issue, would permit the assessment of multiple years of retroactive penalty interest where a lender, aware of a claimed breach of a loan covenant by virtue of a borrower’s DSR as disclosed in its financials, delayed asserting its claim for default interest.

 Renovator’s Supply v. Sovereign Bank, 72 Mass.App.Ct. 419, 433 (2008), a case which is cited by the plaintiffs in support of their claim for violation of c. 93A, represents an instance in which a trial-level determination of a violation of the covenant by a bank’s conduct toward a borrower was overturned on appeal. That case, however, in which the bank’s liability was affirmed on the c. 93A count and a second count for equitable estoppel, rejected the breach of covenant claim on the basis that it involved conduct related to creation of a new contract between the parties, rather than performance under an existing contract. Id., at 433. See Uno Restaurants, Inc. v. Kenmore Realty Corp., 441 Mass. at 385. The present case, by contrast, unquestionably involves an on-going contractual agreement between the defendant bank and the plaintiffs.

 The court examines all of the circumstances of the parties’ interaction concerning the claimed loan default in deciding the issue of reckless disregard. Among the factors which inform the court’s decision was Daley’s use of plainly inaccurate figures at the time of the June 13 meeting for the purpose of casting AIR’s financial situation in a more drastically negative light.

 That single damages figure excludes the $3,080.00 legal fee overcharge which had been remitted to the plaintiffs in January of 2006.

 It is recognized that parties to a contract which includes an indemnification agreement generally are held to performance of their bargain unhampered by generalized considerations of public policy, see Kelly v. Dimeo Waterproofing Co., 31 Mass.App.Ct. 626, 630-31 (1991), citing Crimmins&Pierce Co. v. Kidder Peabody Acceptance Corp., 282 Mass. 367, 379 (1933). That the conduct of the putative indemnitee here does fit within the language of the exclusion avoids a result which would be both anomalous and inequitable in the factual circumstances presented.