## Uno Restaurants, Inc. *vs.* Boston Kenmore Realty Corporation.

Suffolk. December 1, 2003. - April 1, 2004.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Real Property,* Sale, Right of first refusal. *Contract,* Sale of real estate, Implied covenant of good faith and fair dealing. *Consumer Protection Act,* Sale of commercial property, Businessman's claim.

In a civil action centered on the sale of a building comprised of condominium units, there was no evidence that a third party's offer triggering a lessee's right of first refusal was not a bona fide offer. [382-384]

This court concluded that the implied covenant of good faith and fair dealing did not require the owner of a building comprised of condominium units, only one of which was subject to a right of first refusal, to ensure that an unsolicited offer by a third party to purchase the entire building was allocated such that the amount offered for the unit subject to the right of first refusal did not exceed its proportionate value of the entire building, where there was no evidence of collusion between the owner and the third-party offeror, and where the building owner's only duty was to give the holder of the right of first refusal seasonable notice of the third party's unsolicited offer. [384-389]

Although the judge at the trial of a claim for unfair or deceptive trade practices under G. L. c. 93A, § 11, erred in stating that the plaintiff failed to show that the defendant engaged in "wilful" deception, when liability, not multiple damages, was at stake, the judge's isolated misstatement did not affect his other findings supporting a determination that the defendant did not violate the statute. [389]

Civil action commenced in the Superior Court Department on March 4, 1997.

The case was tried before *John C. Cratsley,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Kevin T. Peters* for the plaintiff.

*Paul Killeen* (*Pamela R. O'Brien* with him) for the defendant.

Spina, J. The central issue in this case is whether the covenant of good faith and fair dealing requires the owner of a building

comprised of condominium units, only one of which is subject to a right of first refusal, to ensure that an offer by a third party to purchase the entire building is allocated such that the amount offered for the unit subject to the right of first refusal does not exceed its proportionate value of the entire building. We conclude that, in the circumstances of this case, it does not.

Uno Restaurants, Inc. (Uno), commenced a civil action seeking to enjoin the sale to Coles Holdings, Ltd. (Coles), of a commercial condominium unit, which Uno leased from Boston Kenmore Realty Corporation (Boston Kenmore) subject to Uno's right of first refusal. Uno's motion for temporary injunctive relief was denied. It proceeded to trial against Boston Kenmore, seeking damages on common-law counts alleging breach of its right of first refusal and breach of the implied covenant of good faith and fair dealing, and on one count alleging a violation of G. L. c. 93A. A jury returned a special verdict on the common-law counts, finding that (1) Coles's offer was not "bona fide, that is, made in good faith"; (2) Boston Kenmore did not "breach the contractual obligations it owed to [Uno] under the [l]ease by failing to allow Uno a right of first refusal when an offer was made by [Coles] to purchase [the unit]"; (3) Boston Kenmore "violate[d] the covenant of good faith and fair dealing under the lease by failing to allow [Uno] a right of first refusal when an offer was made by [Coles] to purchase [the unit]"; and (4) Uno sustained damages of $350,000. The judge reserved the G. L. c. 93A count to himself and determined that there was no violation. He found that there was no collusion between Boston Kenmore and Coles and that the two transactions between them, one for the sale of the unit leased by Uno, and the other for the sale of the other units in the building, were arm's-length transactions that were not linked.

Boston Kenmore appealed from the judgment on the count alleging a breach of the covenant of good faith and fair dealing. Uno appealed from the judgment on the G. L. c. 93A count. On appeal, Boston Kenmore claims error in the denial of its motion for a directed verdict, Mass. R. Civ. P. 50 (a), 365 Mass. 814 (1974), and its motions for judgment notwithstanding the verdict, or alternatively, for a new trial, Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998). It also claims that the

judge erred by (1) instructing the jury they could consider Coles's intent in rendering their verdict; (2) failing to instruct the jury that they should only consider the purchase and sale agreement for the unit leased by Uno and not the separate purchase and sale agreement for the remaining units in the building; and (3) failing to instruct the jury correctly on the issue of damages.

In its cross appeal Uno claims that the judge erred by (1) failing to admit evidence of Coles's initial offer to purchase the entire building, rejected by Boston Kenmore; and (2) applying a requirement of wilfulness to Uno's claim of simple damages under G. L. c. 93A. We granted Boston Kenmore's application for direct appellate review. We order entry of judgment for Boston Kenmore on the count alleging a breach of the covenant of good faith and fair dealing, and therefore need not consider Boston Kenmore's challenges to the jury instructions. We affirm the judgment for Boston Kenmore on the count alleging a G. L. c. 93A violation.

1. *Facts.* The evidence, illuminated most favorably for the plaintiff, see *Tosti* v. *Ayik*, 394 Mass. 482, 494 (1985), would support the following findings on the count alleging a breach of the covenant of good faith and fair dealing. In 1977, Boston Kenmore acquired the Buckminster Hotel building at 645 Beacon Street in Boston's Kenmore Square for $350,000. In February, 1984, Boston Kenmore entered into a lease with Hamiltonian Company, Inc., Uno's predecessor in interest, for approximately 11,200 square feet of the first floor and the basement of the hotel for use as a restaurant and lounge. The lease provided at art. 1.6 that Hamiltonian would pay "as additional rent . . . 9.3[%]" of any increase in real estate taxes on the hotel above the amount assessed for fiscal year 1984.[1] Article 10.5 of the lease created a right of first refusal, and states in relevant part:

> "In the event the Building containing the Demised Premises shall be converted to the status of a condominium, Tenant shall have the right of first refusal to purchase the

---

[1]This percentage was an estimated calculation of the spatial ratio between unit 103 and the floor space of the entire building.

Demised Premises and any other space in the Building which it may then occupy and lease from the Landlord (the 'Space') *at the initial purchase price set upon said Space or upon the same term[s] and conditions offered by any other party for the said space.* Tenant shall have thirty (30) days from the date of written notification of that purchase price to inform Landlord that it wishes to purchase said Space and thirty (30) days thereafter to enter into a purchase and sale agreement with Landlord on those terms offered by any other party and upon all other terms and conditions negotiated by Landlord and Tenant in good faith (this right of first refusal ceasing if agreement is in good faith not reached within such period)." (Emphasis added.)

According to the trial testimony of a witness for Uno, the parties to the original lease had a parol understanding[2] that if Boston Kenmore "set" the price at which the entire hotel condominium were to be marketed, then the price of the unit designated as the leased premises would be "set" at 9.3 per cent of that figure.

On December 26, 1986, Boston Kenmore converted the hotel into 133 residential and commercial condominium units by recording a master deed pursuant to G. L. c. 183A, § 8, with the Suffolk County registry of deeds. At all material times Boston Kenmore retained ownership of all the condominium units. The leased premises had been designated as unit 103, consisting of 12,159 square feet, or 15.9% of the area of the entire building. In September, 1987, Hamiltonian assigned, with Boston Kenmore's consent, its interest in the lease to Uno. In 1995, facing extreme financial problems, Boston Kenmore offered to sell unit 103 to Uno for $1.5 million. Uno declined.

In early February, 1997, Boston Kenmore received an unsolicited offer from Coles to buy the entire building at 645 Beacon Street for $8 million. Other than the offer to sell the leased premises to Uno, described above, Boston Kenmore had made no attempt to sell any of the units. Coles's offer was presented through Shlomo Salomon, a real estate broker and

---

[2] As there was no objection to this evidence at trial, we do not decide whether the admission of this testimony was contrary to the parol evidence rule.

nephew of Edmund Shamsi, Boston Kenmore's president. Salomon had not been engaged in any ongoing business relationship with Shamsi or Boston Kenmore, although he had brokered a sale of another property sold by Shamsi to Coles. Shamsi rejected the offer, indicating that Coles would have to make two separate offers, one for unit 103 and the other for the balance of the building.

Coles responded with an offer of $2.8 million for unit 103, and an offer of $5.2 million for the other units in the building. Shamsi indicated that the offer of $2.8 million for unit 103 was acceptable, but said he wanted $15 million for the entire building. They eventually executed two purchase and sale agreements in late February: one for $2.8 million for unit 103; and the other for $11.2 million for the remaining 132 units in the building. The purchase and sale agreement for the 132 units stated that if the "time for performance" for the purchase of unit 103 was delayed, then the "time for performance" for Coles to purchase the 132 remaining units would be similarly delayed.

There was no evidence that Shamsi influenced the allocation of the $14 million between the two purchase and sale agreements. The allocation was left entirely to Coles. There was no evidence of any collusion between Boston Kenmore and Coles to defeat or frustrate Uno's right of first refusal. There was no evidence that any of the officers or directors of Boston Kenmore was in any sense connected to Coles or its owners.

After the purchase and sale agreements with Coles had been fully executed, but before the date of closing, Boston Kenmore retained a real estate appraiser to furnish an appraisal of unit 103. The appraiser opined that the fair market value of unit 103 was between $2.23 million and $2.8 million. The purchase and sale agreements had been negotiated on behalf of Coles by Ming Chou Slomiak, who did not rely on any appraisal of the property. She testified that she had calculated the value of unit 103 by considering the advantages of its location, Kenmore Square, and multiplying its square foot value, $280 in her view, by her belief that its area was approximately 10,000 square feet. Her valuation of the remaining units was based on their poor condition and the fact that in the aggregate they generated

slightly more than one-half as much gross revenue as Uno's operations in unit 103. Moreover, because Coles would be paying cash for all the units, she was not concerned about the cost of borrowing and focused primarily on the advantageous location of the building.

Boston Kenmore gave Uno written notice of Coles's offer to purchase unit 103, and reminded Uno that it had thirty days to exercise its right of first refusal under art. 10.5 of the lease. It also forwarded to Uno a copy of the purchase and sale agreement. Uno responded in writing, purporting to exercise its right of first refusal by offering to pay $1,390,200 for unit 103, a figure that it determined was the appropriate allocation of the total purchase price for the entire building to unit 103 based on the ratio of the assessed value of unit 103 to the assessed value of the entire building (9.93%). In its response, it claimed that the "inflated allocation" of $2.8 million to unit 103, "coupled with a deflated allocation to the remaining 132 units in the Building — deprives Uno Restaurants of its ability to exercise its Right of First Refusal in a meaningful manner. Indeed, Boston Kenmore has an obligation to Uno Restaurants to protect Uno Restaurants' ability to exercise its Right of First Refusal in an effective manner. See, e.g., *Anthony's Pier Four, Inc.* v. *HBC Associates*, 411 Mass. 451, 471 (1991) ('The implied covenant of good faith and fair dealing provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" ')." At trial there was no evidence concerning the fair market value of all of the remaining 132 condominium units, or whether the $11.2 million offered to acquire them was disproportionately low in relation to the $2.8 million offered for unit 103.

The sale to Coles of the entire building took place on March 19, 1997, during a single closing at which two separate deeds were delivered, one to unit 103, and one to the remaining 132 units in the building. After the closing, Uno entered into a lease extension agreement with Coles.

Uno's theory of damages was based on its inability to own unit 103, in contrast to leasing the unit for twenty years, which it claimed was the result of Boston Kenmore's violation of the

covenant of good faith and fair dealing. Uno's expert economist opined that unit 103 was worth between $1.4 million and $1.65 million. Based on a purchase price of $1.4 million for unit 103, he opined that the benefits of leasing over twenty years, as compared to the benefits of owning the unit, would result in damages of $788,000. He testified that, based on a purchase price of $1.65 million, Uno's damages would be $725,000.

2. *Directed verdict.* Uno's theories of liability for breach of the covenant of good faith and fair dealing included claims that Boston Kenmore accepted offers from Coles that were not bona fide, and that Boston Kenmore had a duty to stop Coles from offering a price for unit 103 that Uno reasonably would not be willing to meet, or at least require a fair allocation of the offering price to unit 103. In its motion for directed verdict, Boston Kenmore argued that Coles's offers were bona fide, and that it had no duty to participate in the allocation of Coles's offers. These issues have been preserved for review. *King* v. *G & M Realty Corp.*, 373 Mass. 658, 659 & n.3 (1977) (defendant must move for directed verdict at close of its own evidence, at close of all evidence, and must move for judgment notwithstanding verdict). When reviewing a denial of a defendant's motion for directed verdict we consider all evidence in the light most favorable to the plaintiff. *Bellenger* v. *Nally*, 282 Mass. 523, 526 (1933).

(a) *Right of first refusal.* A right of first refusal is not an option to purchase property at a certain price, but a limitation on the owner's ability to dispose of property without first offering the property to the holder of the right at the third party's offering price. 25 S. Williston, Contracts § 67:85 (4th ed. 2002).[3] The conditions of, and the duties imposed by, a right of first refusal are well established. *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep*, 423 Mass. 81, 89 (1996). The owner's obligation under a right of first refusal is to provide the holder

---

[3]The only distinction between a right of first refusal and mere negotiation for sale of property is the preemption function. 3 A. Corbin, Contracts § 11.3 (rev. ed. 1996). Unlike an option contract, which enables a lessee to compel the property owner to sell the property at a stipulated price despite an unwilling owner, a right of first refusal merely allows the lessee to match the owner's sale price or a third-party offer. See W.V. Hovey & A.B. Koenig, Legal Forms §§ 11.1, 11.2 (4th ed. 1999).

of the right seasonable disclosure of the terms of any bona fide third-party offer. See *Sudbury* v. *Scott*, 439 Mass. 288, 297 (2003). It is the prerogative of the holder then to decide whether to purchase the property at that price. 25 S. Williston, Contracts, *supra.*

A right of first refusal is triggered by a bona fide third-party offer to purchase the property burdened by the right. See *Roy* v. *George W. Greene, Inc.*, 404 Mass. 67, 69-70 (1989). Generally, an offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). A third-party offer is bona fide if it was made "honestly and with serious intent," *Mucci* v. *Brockton Bocce Club, Inc.*, 19 Mass. App. Ct. 155, 158 (1985), that is, if the offeror genuinely intends to bind itself to pay the offered price. The requirement that triggering offers be bona fide serves to disable property owners from extinguishing a right of first refusal by simply relaying vague offers that may include indefinite terms from unidentified third parties. See *Burzynski* v. *Travers*, 636 F. Supp. 109, 113 (E.D. N.Y. 1986).

Boston Kenmore argues that there was no evidence that Coles's offer was not bona fide. Uno argues that Coles's offer was not bona fide because the offer for unit 103 was disproportionately high and the offer for the remainder of the building was disproportionately low. However, Uno offered no evidence that the price for the other units was discounted — the only evidence presented by Uno was that the $2.8 million price offered for unit 103 was higher than the fair market value of unit 103. Conspicuously absent was any evidence of an appraisal of the remaining units, and there was thus no basis on which the jury could conclude that there was any imbalance in the price allocation. Even if Coles inflated the price offered for unit 103, that would not necessarily mean that the offer was not bona fide. So long as Coles honestly intended to be bound by its offer, it would be bona fide. Whether Slomiak's valuation system was less than sophisticated or incongruent with traditional appraisal practice is irrelevant so long as it was made honestly and with the intent to be bound by the terms. There was no evidence that Coles did not intend to be bound by its offers.

Uno also argues that Coles made separate offers for unit 103 and the other units, and that because the agreement for the other units was conditioned on Coles's ability to acquire unit 103, Coles's offer was not bona fide. Although the agreements did not contain language that is commonly used to create a conditional offer, the jury could have construed the agreements in the manner suggested by Uno. Yet there is nothing about the nature of conditional offers that compels an inference of bad faith. See *Mucci* v. *Brockton Bocce Club, Inc.*, *supra* at 158-159 (bona fide offer prompts right of first refusal even if conditional). Moreover, the evidence in this case does not support a finding that Coles acted in bad faith in making its offers.

Even if Coles were motivated by a desire to defeat Uno's right of first refusal, the offer may still be bona fide. Inherent in a right of first refusal is the fact that a third party, not the holder of the right, will dictate the price, and the holder therefore runs the risk that the third party will agree to a price that is above market value, or that is above what the holder is willing and able to pay.[4] To require Coles to offer a price that Uno would consider low enough to exercise successfully its right contradicts the practical application of the right of first refusal. As owner of the property, Boston Kenmore was prohibited from obstructing Uno's right of first refusal. Cf. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 472 (1991). But Coles was not similarly constrained. It had no contractual relationship with Uno, but was instead a competitor for the property. Nothing precluded Coles from trying to outbid Uno by offering a price that Uno was unlikely to match. There was no evidence that Coles's offers were not bona fide.

(b) *Covenant of good faith and fair dealing.* Boston Kenmore argues that there was no evidence that it violated its covenant of good faith and fair dealing. It contends that it did everything required of it under Uno's right of first refusal and cannot be required to do any more. In particular, Boston Kenmore argues

---

[4]The right necessarily requires that the holder be bound by the exact price set and offered by the third party because without such a rule the holder could impede the marketability of the property. *Miller* v. *LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 (7th Cir. 1996). See *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep*, 423 Mass. 81, 87 (1996) (right cannot be used to deprive owner of economic value of property).

that it had no duty to reallocate the amounts offered by Coles to the satisfaction of Uno. Uno argues that Boston Kenmore had a duty under the covenant of good faith and fair dealing to allocate Coles's offers to reflect the relative values of unit 103 and the balance of the building.

The covenant of good faith and fair dealing is implied in every contract. *Kerrigan* v. *Boston*, 361 Mass. 24, 33 (1972), quoting *Clark* v. *State St. Trust Co.*, 270 Mass. 140, 152-153 (1930). The covenant is preserved so long as neither party injures the rights of another to reap the benefits prescribed by the terms of the contract.[5] See *Druker* v. *Roland Wm. Jutras Assocs., Inc.*, 370 Mass. 383, 385 (1976), and cases cited. The duty of good faith and fair dealing concerns the manner of performance. See *Hawthorne's, Inc.* v. *Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993); 23 S. Williston, Contracts § 63:22 (4th ed. 2002).

The covenant may not, however, be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance. See *Cadle Co.* v. *Vargas*, 55 Mass. App. Ct. 361, 366 (2002); Restatement (Second) of Contracts § 205 (1979). Therefore, in the absence of collusion, a determination of good faith and fair dealing in the context of a right of first refusal rests on the adequacy of the notice afforded to the holder of the right regarding any third-party offer. See *Sudbury* v. *Scott*, 439 Mass. 288, 297-298 (2003); *Stone* v. *W.E. Aubuchon Co.*, 29 Mass. App. Ct. 523, 527 (1990) ("an option may be exercised only in strict compliance with its terms").

Uno's right of refusal did not contain express terms requiring a particular allocation of the purchase price in the event of an offer for units in addition to unit 103. Uno's lease with Boston Kenmore created the right to purchase unit 103 at either an initial sale price set by Boston Kenmore, or on the same terms of any bona fide offer made by a third party. The lease did not

---

[5] A plaintiff must show a lack of good faith and is not required to show that the defendant acted in bad faith. See *Nile* v. *Nile*, 432 Mass. 390, 398-399 (2000).

provide, although it could readily have done so, that the initial sale price would reflect a certain percentage of the total sale price for the entire building, or that Boston Kenmore would reject any bona fide offer for the entire building unless the offer for the leased premises reflected no more than that (or some other specified) percentage. Where there are many varying methods by which the holder's right of first refusal may be protected in the event an offer for that property also includes other property, we are reluctant to conclude that the covenant of good faith and fair dealing has, sub silentio, provided a specific form of protection that is not mentioned in the parties' contract.

Here, Boston Kenmore received an unsolicited offer from Coles. The terms of Coles's offer, therefore, determined the terms of Uno's right of first refusal. Boston Kenmore provided Uno with written notice of Coles's offer to purchase unit 103, reminded Uno that it had thirty days to exercise its right of first refusal, and provided Uno with a copy of the purchase and sale agreement. Nothing more was required of Boston Kenmore. Boston Kenmore was not required to reject Coles's offers and negotiate a price allocation more favorable to Uno. See *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep*, 423 Mass. 81, 87 (1996) ("The owner is not required to sell to the tenants on terms less favorable than he or she can receive from a third party"). Because Uno's right of first refusal only required Boston Kenmore to notify Uno of a third party's unsolicited offer to purchase unit 103, the covenant of good faith and fair dealing only required Boston Kenmore to give seasonable notice of Coles's offer.

Uno further argues that Boston Kenmore breached the covenant of good faith and fair dealing by its "inaction." See Restatement (Second) of Contracts, *supra* at § 205 comment d. Inaction amounts to a lack of good faith in contract performance only when the contracting party had a duty to act. Here, there was parol evidence that, if Boston Kenmore set the initial sale price for the entire building, the price for unit 103 would be 9.3 per cent of the asking price. However, Boston Kenmore did not set any price, either for unit 103 or for the entire building. Coles made an unsolicited offer. As discussed above, because Coles's offers were unsolicited, Boston Kenmore's duty was

limited to giving seasonable notice of the terms of the offers. Contrary to Uno's contention, Boston Kenmore was under no duty to stop Coles from making the offers, or to reject the offers.

Even if Coles's offers reflected a desire to defeat Uno's right of first refusal in the sense of offering more for unit 103 than Uno would be willing to pay, such a desire does not constitute a lack of good faith on the part of Boston Kenmore. Like any seller, Boston Kenmore was entitled to reap the benefit of the higher price that results from one buyer trying to outbid a potential competing buyer. There was no evidence that Boston Kenmore influenced or attempted to influence the amount Coles allocated to unit 103, or did anything to impair Uno's right of first refusal. See *Miller* v. *LeSea Broadcasting, Inc.,* 87 F.3d 224, 228 (7th Cir. 1996) (owner may not "procure from the third party terms that the grantor knows are unacceptable to the holder of the right of first refusal"). Any potential motive on behalf of a third-party bidder cannot be imputed to the property owner where there is no evidence of collusion between the owner and the third-party offeror. See *In re Friday Afternoon, Inc.,* 73 B.R. 940, 945 (Bankr. D. Mass. 1987) (analysis of good faith reserved to seller, not buyer).

Recognizing that it has no such evidence of collusion, Uno essentially contends that Boston Kenmore's acceptance of a grossly disproportionate allocation of the price, accepting an inflated price for unit 103 in tandem with an artificially low price for the remaining units, is sufficient to make Boston Kenmore complicit in a scheme to evade Uno's right of first refusal. For purposes of the present case, we need not decide whether, at some extreme degree of disproportion, a seller would violate the covenant of good faith and fair dealing. Assuming, without deciding, that accepting an offer so disproportionately high for unit 103 and so disproportionately low for the other units might constitute a breach of the covenant, there is no evidence of such gross disproportion in the present case. There is no evidence that the $11.2 million offer for the other units in the building was less than what they were worth, and thus no evidence that the price had been artificially shifted to unit 103. Uno claims that this glaring omission from the evidence — i.e., the lack of any appraisal of the other units — can be cured merely by the

parties' implicit acknowledgment that the total $14 million price for the entire building was reasonable. The mere fact that these parties agreed to this total price does not mean that $14 million was reflective of fair market value. It remains equally possible that, just as Coles agreed to pay an inflated amount for unit 103, it paid a comparably inflated amount for the other units. Uno's theory of breach is premised on there being a gross, obvious, and egregious degree of disproportion and imbalance in the price offers. Such disproportion and imbalance cannot be established merely by showing that the price for one unit was somewhat higher than fair market value. That is all that Uno's evidence established, and therefore, assuming (without deciding) that its theory is valid, it failed to introduce evidence sufficient to support that theory.

Because the covenant of good faith and fair dealing does not serve to impute greater rights or impose impractical duties not contemplated in the contractual relationship, see *In re Greenberg*, 229 B.R. 544 (Bankr. 1st Cir. 1999) (covenant of good faith and fair dealing requires banks to be honest with customers but does not require that they fashion most advantageous prepayment method for customers), we decline to impose an additional duty to police potential third-party offers to ensure a particular allocation that would be considered satisfactory to the holder of the right of first refusal. Those obligations can be and frequently are negotiated as terms of the contract itself. The purpose of the covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate. Imposing a duty of precise allocation on owners of property burdened with rights of first refusal would essentially mandate that they reject any offers potentially undesirable to the holder of the right.[6] This would exceed the well-defined protection afforded by a right of first refusal agreement. See *Greenfield Country Estates Tenants Ass'n, Inc.* v. *Deep, supra* at 89.

Uno did not have the right to purchase unit 103 at either a fair price, market price, or at a price dictated by the terms of an option agreement. If Uno desired such a warranty regarding the

[6]Under fundamental principles of contract law, a counteroffer operates as a rejection of the original offer. See 1 S. Williston, Contracts § 5:3, at 629 (4th ed. 1990).

price at which it could purchase unit 103, it could have bargained for it. It did not. Further, Uno was not protected from potential third parties whose business judgment prompted them to offer a competitive price. Rights of first refusal provide the weakest protection of all possible option arrangements. *Miller* v. *LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 (7th Cir. 1996). By its very nature, a right of first refusal that burdens land desired by a third party encourages the third party to offer the highest price possible. Uno could have negotiated for an option arrangement or a right of first refusal to purchase unit 103 based on the terms it now considers favorable. The covenant of good faith and fair dealing shall not substitute for its failure to negotiate those terms. The motion for directed verdict should have been allowed.

3. *General Laws c. 93A, § 11, claim.* Uno correctly asserts that the judge erred by finding that Uno failed to show that Boston Kenmore engaged in "wilful" deception, as required by G. L. c. 93A, § 11. "Wilful" conduct is not required to show a violation of § 11, but only a claim for multiple damages under § 11. However, it is clear that the judge's isolated misstatement, when viewed in the context of the decision in its entirety, did not produce an incorrect result. The judge found that Boston Kenmore took no part in the allocation of the total price for the properties; that Coles used a square footage calculation to determine the offer for unit 103; and that the final purchase and sale documents created no connection between the sale of unit 103 and the sale of the balance of the units in the building. The judge found that the parties engaged in a "traditional, business-like, arm's-length transaction." Such findings support a determination that Boston Kenmore did not engage in unfair or deceptive trade practices in violation of G. L. c. 93A, § 11, and that the judge's misstatement did not affect that result.

For the foregoing reasons, we reverse the denial of the motion for directed verdict and order that the judgment be vacated and judgment be entered for Boston Kenmore, and we affirm the judgment dismissing the G. L. c. 93A, § 11, claim.[7]

*So ordered.*

---

[7] In light of our disposition we do not address the other issues raised on appeal.