NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

23-P-372                                        Appeals Court

CLASSIC RESTAURANT CONCEPTS, LLC <u>vs</u>. PRESIDENT AND FELLOWS OF HARVARD COLLEGE.

No. 23-P-372.

Suffolk.     February 16, 2024. - June 25, 2024.

Present: Sacks, Singh, & Walsh, JJ.

<u>Contract</u>, Lease of real estate, Implied covenant of good faith and fair dealing. <u>Real Property</u>, Lease. <u>Fraud</u>. <u>Landlord and Tenant</u>, Quiet enjoyment, Constructive eviction. <u>Damages</u>, Breach of covenant of quiet enjoyment. <u>Consumer Protection Act</u>, Lease, Businessman's claim, Unfair or deceptive act. <u>Practice, Civil</u>, Summary judgment, Fraud, Consumer protection case. <u>Declaratory Relief</u>.

<u>Civil action</u> commenced in the Superior Court Department on August 25, 2017.

The case was heard by <u>Michael D. Ricciuti</u>, J., on a motion for summary judgment.

<u>Philip Y. Brown</u> (<u>Amelia R. Gray</u>, also present) for the plaintiff.
<u>Richard J. Riley</u> for the defendant.

SACKS, J. In this commercial lease dispute, the lessee,

Classic Restaurant Concepts, LLC (Classic), sought damages from

the lessor, the President and Fellows of Harvard College (Harvard), based on the closure of a street in front of the leased premises in connection with a Harvard construction project.  Classic now appeals from a summary judgment entered in favor of Harvard on all counts of Classic's complaint and on Harvard's counterclaim for lost rent for breach of the lease. We affirm so much of the judgment as dismissed Classic's claims for fraudulent inducement, fraud, negligent misrepresentation, and nuisance (counts I-IV).  We vacate so much of the judgment as dismissed Classic's claims for breach of the lease's covenant of quiet enjoyment, breach of the implied covenant of good faith and fair dealing, violation of G. L. c. 93A, § 11, and declaratory judgment (counts V-VIII), and we vacate the money judgment on Harvard's counterclaim for lost rent.

Background.  In 2011, Harvard leased the premises at 8 Holyoke Street in the Harvard Square area of Cambridge (premises) to a tenant that operated a restaurant.  In late 2014, the tenant wanted to opt out of the lease, and so Harvard asked Classic if it was interested in opening its own restaurant on the premises.  Harvard informed Classic that, beginning in April 2016, Harvard's building then known as Holyoke Center -- which was directly across Holyoke Street from the premises and which occupied an entire city block -- would undergo substantial

renovations, continuing through 2018, and would become the new Smith Campus Center (SCC).

Classic was interested.  In September 2015, Classic acquired the prior tenant's leasehold interest, and on September 11, 2015, Harvard and Classic signed an amendment to the original lease.  For convenience we refer to the lease as so amended simply as the lease.[1]

The lease required Classic to continuously operate a restaurant on the premises.  The restaurant, to be named En Boca, was required to be "a distinctive 'destination restaurant' of high quality . . . serving . . . high-quality fare, offering distinct lunch and dinner menus . . . having an atmosphere of fine dining with full service provided by a highly trained wait staff" and not serving fast food or operating on a "quick serve" basis.  The lease included a covenant of quiet enjoyment.

The lease further required Classic to operate the restaurant in a manner that "maximize[d] the amount of [g]ross [r]evenue that can be produced," and if gross revenue exceeded specified base amounts in various years, a percentage would be paid to Harvard as additional rent.  Harvard agreed to charge below-market rent in the beginning years of the lease.  Harvard also abated the rent entirely through the end of February 2016.

---

[1] As discussed _infra_, a second amendment to the lease was executed in November 2016.

By January 2016, Classic was in possession of the premises at 8 Holyoke Street, and within a month or two thereafter Classic began demolition, to be followed by renovations.

In March 2016, Harvard's contractor for the SCC project directly across Holyoke Street, Consigli Construction Co. (Consigli), received permission from the Cambridge department of public works to close Holyoke Street to vehicular through-traffic during construction work hours, in order to facilitate the construction, beginning in April 2016. The sidewalk in front of the premises remained open but Consigli expected, and had already informed Harvard, that the street closure could continue (albeit not necessarily every day) until the end of the SCC project in August 2018. Although Consigli was carrying out the work, there was evidence that the final decision on a construction "means and methods" issue such as a street closure would be up to the client, i.e., Harvard.[2]

---

[2] This evidence came from one of Classic's principals, based on his experience working with contractors. He stated that even if a contractor told a client that closing a street for two and one-half years was the best way to conduct a project and save money, the client could say, "no, we can't do that. We'll have to spend more money and make it more equitable around the building for other people to share the burden on their businesses." Relatedly, a Consigli project executive agreed that Harvard either had directed or was understood to "want [Consigli] to limit" construction impacts such as street closures. Classic thus may be able to prove that Harvard could control Consigli's actions in this regard.

Classic opened its restaurant sometime in the fall of 2016, but, according to one of Classic's principals, the construction made Holyoke Street "a war zone. The street you couldn't get down. Even our sidewalk, the fence was only a couple of feet wide. It was hard to get to the restaurant." Classic paid Harvard only two months' rent, and the restaurant ceased operations as of June 2017. As Consigli anticipated, Holyoke Street remained closed until the summer of 2018.

Classic commenced this action, claiming that the closure of Holyoke Street, for Harvard's benefit, interfered with the restaurant's operations and caused or significantly contributed to its demise. Classic now appeals from the summary judgment in Harvard's favor.

Discussion. Our review is de novo. We consider all of the evidence before the motion judge and draw all reasonable inferences therefrom in favor of the nonmoving party, Classic. See Miller v. Cotter, 448 Mass. 671, 676 (2007). We review whether Harvard, as the moving party, met its burden of showing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Drakopoulos v. U.S. Bank Nat'l Ass'n, 465 Mass. 775, 777 (2013).

1. Fraud and fraudulent inducement. Classic's claims for fraud and fraudulent inducement asserted that Harvard had failed to disclose information about the impact of the SCC project on

Holyoke Street, and specifically the closure of Holyoke Street, and thereby fraudulently induced Classic to enter into the lease in September 2015.[3]  Classic's theory was that Harvard had a duty to disclose the information, either because disclosure was "necessary to prevent [Harvard's] partial or ambiguous statement of the facts from being misleading," or because "the nondisclosed fact [was] basic to, or [went] to the essence of, the transaction."  Stolzoff v. Waste Sys. Int'l, Inc., 58 Mass. App. Ct. 747, 763 (2003).

The judge ordered summary judgment on these claims because, among other reasons, Classic could cite no evidence that Harvard knew, before executing the lease, the extent to which Holyoke Street would be closed.  On appeal, Classic has not pointed to any such evidence.  The earliest evidence of any discussion of closing Holyoke Street by Harvard (or its contractor Consigli) dates to October 21, 2015, which postdates the execution of the lease.  Classic thus had no reasonable expectation of proving an essential element of its fraud claims -- that, at the time Harvard's alleged nondisclosure of material facts could have influenced Classic's decision to sign the lease, Harvard itself

---

[3] Classic's claim for negligent misrepresentation was dismissed on a ground that did not apply to the fraud claims. On appeal, Classic does not challenge the dismissal.

knew of those facts.[4]  Summary judgment dismissing the fraud claims was therefore proper.  See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

On appeal, Classic presses an additional argument:  that even after the parties executed the lease in September 2015, the claimed fraudulent nondisclosures about the closure of Holyoke Street continued.  In its summary judgment opposition, however, Classic encouraged the judge "to separate Classic's claims into three buckets" and to consider the fraud claims as fitting into the bucket related to "Harvard's conduct leading up to the execution of the lease."  Classic mentioned post-September 2015 nondisclosures only in passing.  Harvard argues that the issue is waived, and we agree.  To whatever extent those later alleged nondisclosures could support fraud claims, Classic "did not sufficiently raise the issue below and is therefore barred from raising it on appeal."  Boss v. Leverett, 484 Mass. 553, 562 (2020).  We return to the issue infra when we discuss Classic's chapter 93A claim, which Classic put into the bucket relating to "Harvard's conduct during the entire relationship."

---

[4] We therefore need not address whether the claims also fail on the ground that nondisclosure of information about the street closure concerned only "conditions to exist in the future" and so could not support a fraud claim.  Stolzoff, 58 Mass. App. Ct. at 759.

2. <u>Implied covenant of good faith and fair dealing</u>. Classic asserts that Harvard committed a breach of the implied covenant of good faith and fair dealing by causing the closure of Holyoke Street to facilitate Harvard's own construction project, thereby interfering with Classic's ability to reap the benefits of the lease. Classic argues that the street closure impaired its efforts to continuously operate a distinctive, high-quality "destination restaurant" on the premises, in a manner that maximized gross revenue, as the lease required.

"The covenant of good faith and fair dealing is implied in every contract, including contracts between sophisticated business people" (quotation and citations omitted). <u>Weiler</u> v. <u>PortfolioScope, Inc</u>., 469 Mass. 75, 82 (2014). "The implied covenant provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" (quotation and citations omitted). <u>Id</u>. The implied covenant "exists so that the objectives of the contract may be realized, [and a] breach occurs when one party violates the reasonable expectations of the other" (quotations and citations omitted). <u>Id</u>.

To show that it was harmed by the street closure, Classic cited the testimony of one of its principals, based on his decades of experience in the restaurant industry, that the type

of customer it was trying to attract did "not . . . want to go down a closed street.  It needs to feel good.  It needs to be warm and welcoming."  The fact that cars could not drive by the front of the restaurant to drop off patrons "crushed the business."  Classic also cited the testimony of an expert in restaurant management that the closing of a one-way street[5] has "a significantly negative impact on retail, especially restaurant, sales on that street.  When a street is physically closed, or even when customers have the perception that it might be closed when they get there, that closing will result in both visibility and accessibility being significantly diminished."

To show that Harvard benefited from the street closure, Classic cited the testimony of a Consigli project executive that closing Holyoke Street (or at least a street near a construction project) is "good for me.  I can build faster.  If the city says you can't close the road, it's going to make the project more difficult for me."  From such evidence it could reasonably be inferred that the street closure allowed Harvard to complete the SCC project more quickly and at less cost.

Despite this evidence that the street closure harmed Classic's ability to operate the restaurant while benefiting Harvard, the judge rejected the implied covenant claim on the

---

[5] It appears undisputed that Holyoke Street is a one-way street.

ground that, in the judge's view, Classic impermissibly sought to read into the lease a provision that "Harvard would prevent the closure of Holyoke Street."  The judge saw this as violating the principle that the implied covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship."  Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (Uno).  The judge reasoned that Classic was aware of the SCC project from the start and "was specifically aware of road closures before it entered into the [s]econd [a]mendment [to the lease[6]] and did not address them in it.  There was thus no intended and agreed expectation regarding road closures that could have been implied . . . and Classic never negotiated for an express term on this point."

The first flaw in this analysis is that Classic never claimed Harvard was required to prevent the closure of Holyoke Street.  Rather, Classic asserts that Harvard was required to refrain from itself causing the closure of Holyoke Street to an extent that would injure Classic's right under the implied covenant "to reap the benefits prescribed by the terms of the [lease]."  Uno, 441 Mass. at 385.  Whether the closure did so is a question of fact, as to which there is a genuine dispute.

_____

[6] The second amendment, signed in November 2016, abated the rent for an additional six months, through September 1, 2016.

That Classic knew of the impending SCC project when it entered the lease is a circumstance that may be considered in evaluating whether and to what extent the closure impaired Classic's right to operate as required by the lease. This is because duties under the implied covenant depend on each party's "reasonable expectations of the other" (quotation and citation omitted). Weiler, 469 Mass. at 82. But Classic's general knowledge of the planned SCC project does not, on this record, equate to specific knowledge of or acquiescence to the closure of Holyoke Street in the manner and for the time periods that it was later closed. Harvard has not established that Classic, in signing the lease, should reasonably have expected the closure to occur.[7] On this record, a factfinder could find that Classic reasonably expected that Harvard would not cause a street closure that would significantly impair Classic's ability to perform the obligations and reap the benefits of the lease.[8]

---

[7] Nor did anything in the second amendment to the lease constitute acquiescence to the closure or otherwise waive Classic's rights under the implied covenant. Notably, on appeal, Harvard does not defend the judge's reasoning based on the second amendment. That amendment, executed on November 17, 2016, merely retroactively extended the rent abatement period through September 1, 2016. So far as appears, the amendment made no other substantive change to the lease. Indeed, the amendment expressly ratified all covenants, terms, and conditions of the lease, and it included an integration clause.

[8] Classic's implied covenant claim, and for that matter its quiet enjoyment claim, alleged breaches based not only on the closure of Holyoke Street but also on Harvard's use of Holyoke

The second flaw in the judge's analysis is his broad reading of the Supreme Judicial Court's statement that "[t]he purpose of the covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate." Uno, 441 Mass. at 388. This statement, taken out of context and applied literally, could entirely negate the implied covenant, by confining it to the enforcement of a contract's express terms. In theory, parties to a contract could always, in retrospect, have negotiated express terms to deal with any possible future action by one party that might injure the other party's ability to benefit from the contract. This is true whether the future action is an employer's termination of a salesperson in order to prevent the salesperson from collecting bonus commissions on sales already made, see Fortune v. National Cash Register Co., 373 Mass. 96, 104-106 (1977), or a lessor's limiting access to the leased premises in order to facilitate the lessor's separate construction project. If the failure to negotiate an express term preventing the employer or the lessor from taking such action rendered the

---

Street during the SCC project in a manner that caused noise, dust, dirt, and grime. Nothing in the statement of undisputed material facts accompanying Harvard's summary judgment motion established that Classic had no reasonable expectation of proving violations based on these other effects. Whether such effects rose to the level of a violation of either covenant presents issues of fact.

implied covenant inapplicable, the implied covenant would be a nullity.

The very phrase "implied covenant," however, contemplates an obligation that is not express in the contract. Proof that the quoted language from Uno does not have the broad scope the judge attributed to it is that the Supreme Judicial Court continues to enforce the implied covenant notwithstanding that language.[9] See, e.g., Robert & Ardis James Found. v. Meyers, 474 Mass. 181, 189-191 (2016) (rejecting claim that trial judge used implied covenant to impose new duty; rather, judge properly enforced duty "to cooperate in effectuating the existing, agreed-upon deal on its own terms"); Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385-388, cert. denied sub nom. Globe

---

[9] Uno may be understood more narrowly. The court there reasoned that "[w]here there are many varying methods by which [a party's express contractual right] may be protected [in the event of a particular contingency confronting the other party], we are reluctant to conclude that the covenant of good faith and fair dealing has, sub silentio, provided a specific form of protection that is not mentioned in the parties' contract." Uno, 441 Mass. at 386. Here, in contrast, Harvard does not point to "many varying methods" by which Classic's contractual right and duty to operate a destination restaurant could be protected against loss of necessary access attributable to Harvard's construction project. The situation might be different if Harvard controlled alternative means of access to the premises that approximated the access available from Holyoke Street. If Harvard offered one of those alternative means to Classic during Harvard's construction project, then Uno suggests that Classic could not invoke the implied covenant to compel Harvard to adopt the particular solution of keeping Holyoke Street open.

Newspaper Co. v. Ayash, 546 U.S. 927 (2005) (jury could reasonably find that hospital breached implied covenant by failing to abide by its own bylaws in its conduct toward its physicians).

We are unpersuaded by Harvard's remaining arguments about why the implied covenant claim should fail as a matter of law. First, Harvard argues that Classic's claim of interference with its high-end restaurant conflicts with the rule that "[i]n the ordinary lease of real estate there is no implied warranty that the premises are fit for occupancy or for the particular use contemplated by the lessee." Gade v. National Creamery Co., 324 Mass. 515, 518 (1949). But Classic does not seek to enforce any such implied warranty. Rather, Classic seeks to enforce what it asserts is Harvard's obligation under the implied covenant not to take action that injures (by impairing access to the premises) Classic's right to do what the lease allows and requires: operate a high-end restaurant. Put differently, Classic does not claim Harvard implicitly promised the premises' suitability for a high-end restaurant, but only that Harvard promised not to injure the premises' suitability for that purpose.

Second, Harvard argues that, because the lease contains an integration clause, the implied covenant cannot be used to enforce "any separate understanding about use of Holyoke

Street," and any evidence of such an understanding would be barred by the parol evidence rule. But Classic does not seek to enforce any such separate understanding. Classic seeks to enforce the implied covenant of good faith and fair dealing, which "is implied in <u>every</u> contract" (emphasis added), <u>Uno</u>, 441 Mass. at 385, even those with integration clauses. See, e.g., <u>Starr</u> v. <u>Fordham</u>, 420 Mass. 178, 184, 188 (1995); <u>Winchester Gables, Inc.</u> v. <u>Host Marriott Corp</u>., 70 Mass. App. Ct. 585, 591-592, 597 (2007); <u>Frostar Corp</u>. v. <u>Malloy</u>, 63 Mass. App. Ct. 96, 104 & n.18, 105-106 (2005).

3. <u>Covenant of quiet enjoyment</u>. Like its claim for breach of the implied covenant of good faith and fair dealing, Classic's claim for breach of the lease's covenant of quiet enjoyment asserted that Harvard, by causing the closure of Holyoke Street, interfered with Classic's ability to operate a restaurant on the leased premises. A breach of the covenant is shown where the landlord "deprives the lessee of a vital part of what the landlord knows the lessee must have in order to carry on [its] business." <u>Charles E. Burt, Inc</u>. v. <u>Seven Grand Corp</u>., 340 Mass. 124, 127 (1959) (<u>Burt</u>). "The covenant . . . protects a tenant's right to freedom from serious interference with [its] tenancy -- acts or omissions that impair the character and value of the leased premises." <u>Doe</u> v. <u>New Bedford Hous. Auth</u>., 417

Mass. 273, 285 (1994).  See Simon v. Solomon, 385 Mass. 91, 102 (1982).[10]

The judge rejected Classic's quiet enjoyment claim on grounds much like those he cited in rejecting the implied covenant claim.  He reasoned that any interference with quiet enjoyment here did not rise to the level of a breach, in light of the evidence "that Classic was well aware that construction of the [SCC] would occur during its tenancy, that [the premises were] not rendered entirely inaccessible to customers as a result of the construction, and that when it entered into the [s]econd [a]mendment, Classic did not address this issue."

We may assume that an evaluation of what "the landlord knows the lessee must have in order to carry on [its] business" or what constitutes a "serious interference" with a tenancy takes into account the parties' reasonable expectations.  Burt, 340 Mass. at 127.  As we concluded above, however, Classic's general knowledge of the impending SCC project does not necessarily equate to specific knowledge of the scope of the closure of Holyoke Street.  Nor does the silence of the second

---

[10] Classic cites the standard from Burt, a commercial lease case.  Burt, 340 Mass. at 124-126.  Harvard cites the standard from Simon, a case concerning the covenant of quiet enjoyment under G. L. c. 186, § 14, protecting residential tenants. Simon, 385 Mass. at 99.  The parties have not addressed and we do not decide whether and, if so, how the standards may differ substantively.

amendment on the street closure constitute Classic's agreement to the closure or waive Classic's rights under the lease's express covenant of quiet enjoyment. Classic seeks not to rewrite the lease but to enforce, as applied to the particular issue of street closure, Harvard's existing, express obligation not to interfere with Classic's quiet enjoyment. Finally, that the street closure did not render the premises entirely inaccessible would not preclude a finding that the closure nevertheless seriously interfered with Classic's tenancy, see Doe, 417 Mass. at 285, or deprived Classic of the reasonable access that Harvard knew Classic needed in order to operate a high-end restaurant while maximizing revenue. See Burt, supra at 127. Whether the closure did so presents disputed issues of fact.

We address Harvard's remaining arguments against the quiet enjoyment claim. First, Harvard asserts that the lease did not give Classic "any rights in Holyoke Street beyond those enjoyed by the general public." But Classic does not assert any such greater rights in Holyoke Street itself. Rather, Classic asserts a right under the lease (one not possessed by the general public) that Harvard not take action, whether by causing the closure of Holyoke Street or otherwise, to interfere with Classic's quiet enjoyment of the premises.

Second, Harvard argues that because Classic "received below-market rent as consideration for likely construction impacts," Classic "accepted the risk of construction adversely affecting its business," and cannot now assert the covenant of quiet enjoyment as a limit on Harvard's freedom to cause such impacts. Once again, however, general knowledge that the SCC project would occur, while a relevant circumstance, does not necessarily constitute agreement to any and all construction impacts no matter how severe their effect on Classic's tenancy, or a waiver of Classic's right under the covenant of quiet enjoyment to challenge specific impacts. Moreover, there is a factual dispute regarding the extent to which the rent concessions were intended to compensate for construction impacts (as Harvard contends) or instead to facilitate Classic's buildout (as Classic asserts).

Third, Harvard contends that, absent any evidence that it carried out the SCC construction in a manner that violated the terms of its various permits or was otherwise unlawful, it cannot be held to have breached the covenant of quiet enjoyment. Harvard relies on cases holding that a property owner's compliance with permits and laws may insulate it from private nuisance claims brought by neighbors. See, e.g., Hull v. Massachusetts Port Auth., 441 Mass. 508, 519 (2004); Strachan v. Beacon Oil Co., 251 Mass. 479, 487-488 (1925). But Harvard

cites no case in which such principles have been applied to covenant of quiet enjoyment claims -- particularly where, as here, the covenant was expressly agreed to by the parties themselves, rather than being implied in law.[11]  See generally Simon, 385 Mass. at 102 (discussing covenant of quiet enjoyment implied at common law and now imposed by G. L. c. 186, § 14).

Fourth, Harvard argues that, to recover on its quiet enjoyment claim, Classic must, but cannot, show that Harvard "at least acted negligently in not alleviating the condition." Jablonski v. Casey, 64 Mass. App. Ct. 744, 748 (2005).  See Al-Ziab v. Mourgis, 424 Mass. 847, 850-851 (1997).[12]  Harvard asserts that it complied with applicable laws and permits and

---

[11] Although claims for private nuisance and for breach of the covenant of quiet enjoyment have elements that are similar -- as illustrated by the description of those claims in Doe, 417 Mass. at 285, 288 -- we know of no case holding that every aspect of the law of private nuisance applies equally to the law of quiet enjoyment.  Indeed, in Doe, the court upheld summary judgment for the landlord on the tenants' nuisance claim, but it ruled that the quiet enjoyment claim presented issues of fact requiring a trial.  See id. at 287-289.  Here, the judge ordered summary judgment for Harvard on Classic's nuisance claim on the same ground relied on in Doe, and on appeal Classic has not argued that doing so was error.

[12] Jablonski and Al-Ziab involved the covenant and the statutory right of quiet enjoyment protecting tenants of residential premises.  See Al-Ziab, 424 Mass. at 850; Jablonski, 64 Mass. App. Ct. at 747-748.  The parties here have not argued that the standard applied to an express covenant of quiet enjoyment in a commercial lease is materially different.  See note 11, supra.

carried out the work in a "reasonable and proper manner." "The key inquiry is whether the serious interference with the tenancy is a natural and probable consequence of what the landlord did, what he failed to do, or what he permitted to be done" (quotation and citation omitted). Goreham v. Martins, 485 Mass. 54, 66-67 (2020). Here, a finder of fact could conclude that, even if Harvard and Consigli carried out the project in a lawful and otherwise reasonable manner, the natural and probable consequence of Harvard's actions causing the closure of Holyoke Street, if proven, was to significantly impair access to the premises and thus seriously interfere with Classic's tenancy. A finder of fact could also conclude that Harvard knew or should have known of this interference and acted at least negligently in failing to take appropriate corrective measures.[13]

4. Chapter 93A. To the extent that Classic's c. 93A claim is based on alleged nondisclosures before execution of the

---

[13] We need not resolve the parties' disagreement regarding whether, under Winchester v. O'Brien, 266 Mass. 33 (1929), a tenant may recover on a quiet enjoyment claim even if "the work was carried on in a reasonable and proper manner." Id. at 38. Although the precise basis of liability in that nearly century-old decision is not easy to discern, Harvard cites no case suggesting that a landlord's performing construction work in a "reasonable and proper manner" constitutes a defense to a quiet enjoyment claim based on the work's effect on the tenant. Rather, the reasonableness of a landlord's affirmative conduct necessarily depends in part on whether the conduct substantially interferes with the tenancy.

lease, it fails for the same reason as the fraud claims: under c. 93A, "[t]here is no liability for failing to disclose what a person does not know." Underwood v. Risman, 414 Mass. 96, 100 (1993). Insofar as the c. 93A claim is based on Harvard's later conduct and statements, however, summary judgment should not have been granted.

First, "a breach of the implied covenant of good faith and fair dealing may constitute an unfair or deceptive act or practice for the purposes G. L. c. 93A." Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 43 (1995). Harvard's alleged actions in causing the closure of Holyoke Street for the benefit of Harvard's own construction project could be viewed as unfair or deceptive under c. 93A for the same reason that those actions could, by injuring Classic's right to reap the benefits of the lease, constitute a breach of the implied covenant.[14]

Second, and similarly, a breach of the covenant of quiet enjoyment could also be viewed as unfair or deceptive under c. 93A. The same conduct may violate both the covenant and the statute. See Cruz Mgt. Co. v. Thomas, 417 Mass. 782, 788-790 (1994); Wolfberg v. Hunter, 385 Mass. 390, 400-401 (1982).

---

[14] Of course, a breach of the implied covenant, or of the covenant of quiet enjoyment discussed infra, would not constitute a per se violation of c. 93A. All elements of a c. 93A claim would still need to be proven.

Third, Classic's summary judgment opposition cited evidence that Harvard did not timely or accurately disclose what it knew about the planned or likely street closure and that Classic was injured as a result. Viewing the evidence in the light most favorable to Classic, in February 2016, Consigli told Harvard that the Holyoke Street closure "will be essentially every day, Monday through Friday for the next 2.5 years," but Harvard did not share this information with Classic. In late February or early March 2016, when the street was first closed and Classic asked Harvard for an explanation, Harvard replied that the closure would end "before school resumed in the fall of 2016." Harvard repeated this assurance in July 2016: "we're going to get it reopened before the school starts." In August 2016, Classic emailed Harvard to express surprise and dismay over reports that the planned closure would last approximately three more months. In mid-September 2016, Harvard sent Classic a copy of a public notice stating that Holyoke Street was expected to be closed a few days per week for the next two weeks, after which it would be closed Monday through Friday from 7 A.M. to 4 P.M. for approximately two and one-half months.

A finder of fact could conclude not only that Harvard did not timely disclose what it knew or expected about the street closure but also that such nondisclosures harmed Classic. There is evidence that Classic spent about $350,000 in preopening

expenses, approximately half of which went to hiring and training employees for a planned August 2016 restaurant opening but that, because of the street closure, Classic delayed the opening and let those employees go, meaning those expenditures "went out the window."  Classic also spent $120,000 or more to retain salaried employees (managers, chefs, and a sommelier) during the two-month period when Classic "had to wait until the road opened in order for [the restaurant] to open."[15]

Harvard argues that nondisclosure of information about the street closure cannot be the basis for c. 93A liability because Harvard had only a "suspicion" about the closure, or an awareness of its "likelihood, rather than knowledge" that it would occur.  Underwood, 414 Mass. at 100 (lessor's general awareness that older houses were more likely to contain lead paint could not make lessor liable for not disclosing presence of such paint to tenant).  See Greenery Rehabilitation Group,

---

[15] The judge rejected Classic's argument that it could have altered the timing of its opening; the judge reasoned that the lease obligated Classic "to open and continuously operate the restaurant."  The lease, however, gave Harvard a choice of remedies for Classic's breach of that obligation, one of which was liquidated damages of $100 per day.  The record does not establish what remedy (if any) Harvard would have sought. Notably, Harvard not only had sought no remedy by September 2016, but in November 2016 it executed the second amendment, extending the rent abatement through September 1, 2016.  Had Harvard sought liquidated damages, it appears Classic could have made a rational choice to pay them in order to avoid larger expenditures.

Inc. v. Antaramian, 36 Mass. App. Ct. 73, 78 (1994) (no c. 93A liability for nondisclosure of "a predictive insight about the future operations of a going business in relation to changing market conditions"). But these cases do not sweep as broadly as Harvard suggests.

In Underwood itself, the court acknowledged its earlier decision recognizing that a landlord's failure to inform prospective tenants of a pending application for rent increases could be an unfair or deceptive act. Underwood, 414 Mass. at 100, citing York v. Sullivan, 369 Mass. 157, 162 (1975). Nothing in York suggests that this result depended on the landlord being certain, at the time the tenants signed their leases, that the application would be granted. York, supra at 157-161.

Here, similarly, it is not dispositive that Harvard may not have known the extent of the street closure with certainty at the time Classic was deciding when to hire and train the new restaurant's staff. A finder of fact could conclude that, at least for a substantial part of 2016, Harvard knew significantly more than it chose to tell Classic, that it was in Harvard's interest for Classic to open and operate, and that Harvard's nondisclosure harmed Classic by causing it to incur pre-opening expenses that turned out to be wasted. A finder of fact could also conclude that Harvard harmed Classic by failing to honor

its assurance that the street would be open by the time school resumed in the fall of 2016.

Harvard may, of course, be correct in arguing that the "appropriate course for a property manager when presented with uncertain information about future construction logistics is to not share information that may prove inaccurate." Whether Harvard's nondisclosures were unfair or deceptive, or instead spared Classic the consequences of uncertainty, depends in the first instance on disputed issues of fact. Summary judgment on the c. 93A claim was therefore erroneous.

5. Remaining claims. Classic asserted a claim for a declaratory judgment that it owed Harvard no money under the lease, that the lease was terminated, and that Harvard was liable to Classic for damages. Harvard counterclaimed for its own damages, including lost rent, for breach of the lease. The judge ruled that for Classic to obtain the requested declaratory relief, Classic would have to prove a constructive eviction under the standards set forth in Wesson v. Leone Enters., Inc., 437 Mass. 708, 713-714 (2002). Concluding that Classic would be unable to do so, the judge ruled that Classic was not entitled to abandon the lease and stop paying rent and that Harvard was entitled to judgment on its counterclaim. The parties then agreed to the entry of a money judgment in Harvard's favor, subject to Classic's right of appeal.

We have concluded above that Classic's claim for breach of the lease's covenant of quiet enjoyment requires a trial. If there is such a breach, "the tenant may raise constructive eviction as a defense to an action to recover rent." Wesson, 437 Mass. at 713. "A constructive eviction is any act of a permanent character, done by the landlord, or by his procurement, with the . . . effect of depriving the tenant of the enjoyment of the premises demised, or of a part thereof, to which he yields and abandons possession, within a reasonable time" (quotations and citations omitted). Id. The landlord's "act must have some degree of substance and permanence of character" (quotation and citation omitted). Id. at 714. "[C]onduct that does not make the premises untenantable for the purposes for which they were used will not constitute constructive eviction" (quotation and citation omitted). Id. For the reasons already discussed in connection with Classic's quiet enjoyment and implied covenant claims, we conclude that issues of disputed fact remain regarding whether the closure of Holyoke Street at Harvard's instance, by interfering with access to the leased premises, constituted a constructive eviction.

Moreover, even if there was no constructive eviction, Classic may still be able to obtain declaratory relief along the lines it seeks, under the rule of mutually dependent covenants adopted in Wesson, 437 Mass. at 720. Under that rule,

> "Except to the extent the parties to a lease validly agree otherwise, if the landlord fails to perform a valid promise contained in the lease to do, or to refrain from doing, something . . . and as a consequence thereof, the tenant is deprived of a significant inducement to the making of the lease, and if the landlord does not perform his promise within a reasonable period of time after being requested to do so, the tenant may . . . terminate the lease."

Wesson, supra, quoting Restatement (Second) of Property (Landlord and Tenant) § 7.1 at 247 (1977). The rule requires a lesser showing than a constructive eviction. It "does not require that the premises be untenantable for the purposes for which they were used," but only that the tenant "demonstrate the landlord's failure, after notice, to perform a promise that was a significant inducement to the tenant's entering the lease," including "promises that constitute a substantial benefit understood at the time the lease was entered to be significant to the purpose thereof" (quotation and citation omitted). Wesson, supra at 721-722.

Here, a determination that Harvard committed a breach of the covenant of quiet enjoyment could support a declaration, under the rule of dependent covenants, that the lease and Classic's rent obligation were terminated.[16] The judgment must

---

[16] The parties have not briefed, and we do not address, whether a breach of the implied covenant of good faith and fair dealing or of any other promise by Harvard could also support such relief.

therefore be vacated insofar as it dismissed Classic's claim for declaratory relief and awarded Harvard damages.

Conclusion.  So much of the judgment as dismissed Classic's claims for fraudulent inducement, fraud, negligent misrepresentation, and nuisance (counts I-IV) is affirmed.  So much of the judgment as dismissed Classic's claims for breach of the lease's covenant of quiet enjoyment, breach of the implied covenant of good faith and fair dealing, violation of G. L. c. 93A, § 11, and declaratory judgment (counts V-VIII) is vacated.  The judgment on Harvard's counterclaim is likewise vacated.

So ordered.